THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiffs in Error, *v.* PHILIP THURBER, Defendant in Error.

### ERROR TO COOK.

Chapter 64, of the Revised Statutes, entitled License, does not violate that provision of the Constitution, which requires that all taxation shall be by valuation, and uniform.

The constitutionality of the law does not depend upon the fact, that license is not required to be issued in all cases; the law itself, when its terms are complied with, becomes a license. The burden imposed by the law need not be uniform.

This law does not violate that provision of the Constitution of the United States, regulating commerce, inasmuch as the law has no reference to commerce in the sense in which it is used in the Federal Constitution.

It is no objection to this law, that it is made to operate directly upon the agents themselves.

This law was not repealed, by abolishing the office of clerk of the County Commissioners' Court; for although there is no express provision made, that the clerk of the County Court should succeed that officer and perform the same duties; yet by implication and a fair construction of all the statutes upon the subject, there can be no doubt but that it was the will and intention of the legislature that the one clerk should succeed the other, and perform all the duties required by law of the clerk of the County Commissioners' Court under the old organization.

THIS is an action of debt against Thurber for violating the 22d and 23d sections of chapter 64 of the Revised Statutes, entitled License, by his acting as the agent of a foreign insurance company without complying with the terms and conditions of said sections. Thurber demurred to the declaration of the plaintiffs, which demurrer was sustained by the Circuit Court, H. T. DICKEY, Judge, presiding, at May term, 1851, and judgment thereon rendered for the defendant. The people bring the case to this court, and assign for error the sustaining of the demurrer to the declaration by the court below.

The opinion gives a full history of the questions involved in this case.

E. PECK, for the plaintiffs in error.

WILSON & FRINK, for defendant in error.

CATON, J.   Under the demurrer which was filed to this declaration, two objections have been urged to the maintenance of this prosecution: 1st, that the act under which it was instituted violates not only the Constitution of this State, but also that of the United States; and 2d, that the law creating the County Court, passed to carry out the new Constitution, having abolished the office of clerk of the County Commissioners' Court, operates as a repeal of the law itself, by abolishing the instrument provided in the law for its own execution.

It is objected that the law in question violates that provision of the State Constitution which was in force at the time the law was enacted, which provides in substance that all taxation shall be by valuation of the property to be taxed, and shall be uniform.   To sustain this objection, it must first be shown that the three per cent. on the amount of the premiums charged by the agent, and which is required to be paid over by him to the clerk, and by him to be paid into the State treasury, is a tax within the meaning of that Constitution.   The 80th section of the 8th article of the old Constitution provides, "that the mode of levying a tax shall be by valuation, so that every person shall pay a tax in proportion to the valuation of the property which he or she may have in his or her possession."   It has never been doubted that the word "tax," as here used, means the tax which is imposed upon a person on account of the property which he has, and has never been held to deprive the legislature of the power to inhibit persons from exercising certain callings, franchises, or privileges, without a license or authority for so doing, which they may withhold entirely, or until a pecuniary compensation shall be paid into either the State, or some town, city, or county treasury.   This power has been exercised by the legislature ever since the adoption of that Constitution, and these laws have been recognized and enforced by the courts during all that time, and we do not feel called upon to enter into an elaborate argument to vindicate such enactments.   Indeed their constitutionality was distinctly admitted upon the argument of this case, while reasons were urged with a view to show that this act did not come within this recognized legislative power.

In the first place, we do not agree with counsel that this three

per cent. is not paid for a license to issue policies and charge premiums as agents of foreign corporations. It is true that no license is required to be issued by the clerk, nor is he authorized to withhold the right to act as such agent from any one who complies with the provisions of the law. But that makes no difference. The law itself is the license; and it would certainly be no more constitutional if it had provided that the clerk should issue a license to such persons as complied with its requirements. Suppose the law had provided that every person who should pay a certain amount into the treasury therefor should be authorized to keep a grocery or exhibit a show, that law would be equally obnoxious to the charge that no license was granted.

It was urged, also, that the authority to issue these licenses, the power to do which was not denied, was the exercise of a right of police, and was rendered necessary and proper, because the exercise of the calling may impose a special burden upon the State or community; but that when a burden is imposed upon the persons who are authorized to exercise the particular calling, it must be uniform, that is, the same amount must be imposed upon each. We cannot appreciate the necessity for adopting this standard of uniformity. As a question of power, we know of no authority for requiring it; and as a question of propriety or of justice, the reason of the thing would seem to be the other way. A grocery, which sells a thousand glasses of liquor in a day, may well be supposed to create more disturbance in society than one which sells but ten, and hence imposes a greater burden upon the State in the preservation of good order; and a circus, with a large company, and which collects a large concourse of people, may in like manner be well supposed to impose a more onerous burden upon society, in the preservation of the laws, than one of less attractions; and we can perceive no impropriety in compelling each to contribute in proportion to the amount of business done or money received. Such a law would be eminently uniform and equal, not only as to the amount of benefits received in the exercise of the license, but also as to the amount of burdens imposed upon the State. So in the case before us, the State is supposed to proceed to a greater or less extent, either directly or through its municipal corporations or by private efforts

of its citizens, for the extinguishment of fires, and these provisions in large cities are usually very expensive, and, as a general thing, the greater the amount of premiums charged by the underwriter, the greater will be the benefit which he receives from these provisions to extinguish fires; and it would be difficult to demonstrate the justice of imposing the same burden upon the agent who charges premiums but to the amount of one hundred dollars, as are imposed upon him who charges ten thousand dollars. In our apprehension, there is and can be no force in the objection that the burden imposed by this law is a per centum upon the amount of premiums charged by each agent, instead of a specific and uniform sum upon each. This is not a tax upon property, but is a burden imposed upon the agent for the right of exercising a franchise or privilege, and which the legislature would have the right to withhold or inhibit altogether, and the amount of premiums charged is merely used as a mode of computing the amount to be paid for the exercise of the privilege. The legislature might have adopted, as a mode of computing the amount, the value of the property insured, and in that event it could hardly be said to be a tax upon that property; or the mode of computation might have been the number of policies issued or risks taken, without regard to the premiums charged, and then what would the tax have been upon? It will be observed that the law in question only applies to agents of foreign insurance companies; and it would be strange indeed if the legislature had not the power to prescribe the terms upon which foreign corporations should be permitted to come into this State and carry on their business, or even to prohibit them altogether. If not, then the power of our legislature to withhold charters of incorporation is but a shadow. Prudent legislation on their part will result in no substantial protection to the people. If foreign, and perhaps irresponsible corporations, may force themselves upon us in defiance of our laws, State sovereignty is but a name. If foreign insurance companies may establish their agencies all over the State, in spite of her sovereign power, then foreign banks may do the same; and where will this new doctrine end, short of an utter prostration of all power in the State to protect her own citizens? It was seriously urged, that the Constitution of the

United States has been violated by this attempt of the legislature to prescribe the terms upon which these agencies of foreign insurance companies might be established here, because it is a regulation of commerce, which is exclusive in Congress. If issuing policies of insurance is a commercial transaction within the provision referred to, of the Federal Constitution, then Congress alone must regulate their issue, and there is no power in the States to limit the right. If this be commerce, in the sense referred to, then surely receiving deposits, drawing bills of exchange, issuing bank-notes, and indeed all other banking business, is none the less so, and all foreign banks may cover the State with their agencies, in defiance of the domestic authorities. Such is not the law in relation to banks or insurance companies. It is as competent for the legislature to regulate the one as the other, and the interests of the people may require that they should be protected from imposition by foreign or even domestic institutions of the one character as much as the other. The whole subject is unquestionably within the control of the legislature, and they are responsible for its judicious exercise. Nor is it any objection that the law is made to operate directly upon the agents themselves. In this way alone could the law be made effectual. The corporations themselves are untangible, or, at any rate, out of our jurisdiction and beyond our reach. The agent is the active instrument in the accomplishment of the prohibited act, and if he does not choose to accept the agency upon the terms upon which the law has authorized him to do so, it is his duty, under the law, to refuse to be made the instrument of its violation. We perceive no objection to the law itself.

The last, however, is a much more difficult question to dispose of satisfactorily, and if the fate of this law alone depended upon its decision, we might hesitate long before holding it to be untenable. The law itself provides, that the notice of the acceptance of the agency shall be filed with, and the three per cent. on the amount of premiums charged shall be paid to, the clerk of the County Commissioners' Court. At that time, there was in each county in the State a court called the County Commissioners' Court, with a clerk and seal. The jurisdiction of this court was principally confined to the transaction of county busi-

ness, but the clerk was authorized to perform a great variety of ministerial acts, independently of, and frequently in no way connected with, the jurisdiction of the court. To these more particular reference will be made hereafter. Not only was the County Commissioners' Court established, in pursuance of power expressly conferred upon the legislature by the old Constitution, but also in like manner was a probate court organized, upon which probate jurisdiction was conferred.

The courts were not in express terms abolished by the new Constitution; but by the 16th section of the 5th article, provision is made for the establishment of a county court in each county, which is made by the 18th section, to supersede the old Probate Court, which confers upon the County Court probate jurisdiction, and which also authorizes the legislature to confer upon it further limited jurisdiction, both in civil and criminal matters; and by the 19th section, the County Court is made to supersede the old County Commissioners' Court, by conferring upon it, the jurisdiction over county business; and this section also provides for the election of a clerk of the County Court, whose compensation shall be fees.

For the purpose of carrying out these provisions of the Constitution, on the 12th of February, 1849, the legislature passed a law for the organization of the county courts, which are declared to be courts of record, with seals; and provides for the election of judges and clerks of those courts. By the 13th section of the act, the probate jurisdiction is conferred upon the County Court in the following terms: " The County Court shall be, and is hereby vested with all the powers and jurisdiction of the Probate Court, as now established by law;" and by the 15th section, the County Court is made to succeed the County Commissioners' Court, as follows: " The said judge with two justices of the peace, designated and provided for, shall, in all cases whatever, sit as a county court; have, exercise, and possess all the power, jurisdiction, and authority, heretofore conferred by law on the County Commissioners' Court of this State; and shall sit for the transaction of county business, on the first Monday of December," &c. Here we find abundant provision made for the transfer of the entire jurisdiction of both of the

old courts to that of the new; and that, of itself, necessarily carries with it authority, for the clerk of the new court to perform all the functions of the clerk of the County Commissioners' Court, so far as those functions related to the jurisdiction of that Court; but as before stated, there was a great variety of duties imposed upon the clerk of the County Commissioners' Court, which had no connection whatever with the jurisdiction or powers of the court of which he was clerk, and which might as well have been imposed upon any other officer or person; and there is no express provision anywhere to be found in the law, transferring these duties from the clerk of the County Commissioners' Court to the clerk of the County Court; and it is this oversight of the legislature, or this omission of the law, which creates all of the embarrassment in the present case. From the nature of these duties, no one can doubt for a moment that it was the intention of the legislature that they should continue to be discharged by some one, for upon the discharge of some of them, the very continuance of the State government depends. In this connection it may be proper to refer to some of these duties, which the clerk of the County Commissioners' Court was required to perform *ex officio.* By the 10th section of the 37th chapter Rev. St. he was required to issue notices of all elections, both general and special. By the 24th section of the same chapter, the poll-books are required to be returned to the same clerk; and by the 25th section, he, together with two justices of the peace, is required to canvass the votes, upon which it is made the duty of the clerk to issue certificates of election to members of the general assembly and county officers, who are found to be elected. By the 26th section, it is provided, that when two or more counties are embraced in one representative or senatorial district, the clerks of the county commissioners' courts of the several counties, are required to meet at the county seat of the oldest county and there canvass the votes of the district. The 28th section requires the clerk to proceed, in case of a tie vote, to determine by lot who shall be declared to be elected. The 29th section requires the clerk of the County Commissioners' Court to make abstracts of the votes given for State officers, and transmit them to the office of the Secretary

of State. Other duties were also required, by the election laws, to be performed by the clerk; but this is enough for my present purpose. These duties, it will be perceived, are entirely distinct from, and independent of, the jurisdiction or duties of the courts of which they were clerks, and were strictly *ex officio* duties. In the new election law, passed by the first general assembly under the new Constitution, and on the same day on which the county-court law passed, no provision whatever is made for the performance of any of these duties, except those prescribed in the 24th section above referred to, which section, with several others of the old law, incompatible with the new one, was expressly repealed; and the repealing clause of the new act provides — "And such sections of said acts as are not herein repealed, shall remain in full force and effect." Among the provisions of the old law, which was thus reënacted or reaffirmed by the new law, were those which required the clerks of the county commissioners' courts to issue notices of elections; and those which required the clerks of the county commissioners' courts of the several counties composing an election district, to meet together, and canvass the votes of the district; and the provision which required the clerks of the county commissioners' courts to determine the election by lot, in case of a tie vote; and yet, the legislature knew that thereafter there would be no clerks of county commissioners' courts in existence, to perform these duties. That it was the will of the legislature, that they should be performed by somebody, is certain, and it is to be regretted that they did not designate more clearly than they have done, by whom these duties should be performed. As the case now stands, the responsibility is thrown upon the court, either of saying, that for the want of sufficient legislation on this subject, no legal election could be held under the new Constitution and the new law, or else of determining, from such lights as we have, to whom these important duties have been transferred; and that too, in the absence of any express enactment making the transfer. Although these were the most vitally important, yet, they were by no means all of the *ex officio* duties, which the clerks of the county commissioners' courts were required to perform; among them may be enumerated the duty of issuing mar-

riage licenses, licenses to showmen, groceries, &c., certificates
for wolf-scalps, receiving and filing bonds of justices of the peace,
and issuing certificates of their official character; and the last
which I will mention, and very important, receiving redemption-
money from sales for taxes. In no subsequent law is there one
word said, expressly declaring that all or any of these or any
other like duties, shall be transferred from the clerk of the County
Commissioners' Court, to any other specified officer; and yet,
we should be slow to believe that it was the intention of the
legislature to annul all these laws, by omitting to provide for
their execution. We are of opinion that such was not the in-
tention of the legislature, and although there is no express pro-
vision of law, specially transferring these duties from the clerk
of the County Commissioners' Court to any other officer, we
think there is sufficient indication of the legislative will to
show to whom they designed that they should be transferred.
We have no doubt that the legislature designed, intended, and
understood that the clerk of the County Court be the successor
of the clerk of the County Commissioners' Court, and that to
him the old records should be transferred, and that he succeeds
to all these various *ex officio* duties, to which reference has been
made. This legislative intention and understanding are clearly
manifested in all the legislation referring to the subject, since
the adoption of the new Constitution. The County Court and
the clerk of the County Court are alike treated and considered,
as the successors, in all respects, of the old court and the for-
mer clerk.

Thus we see whenever it has been found necessary to change
the law in relation to any of these *ex officio* duties, so as to con-
form to the new Constitution, they have, in acts of the same date
or subsequent to the law organizing the County Court, designated
the clerk of the County Court as the officer who shall perform
them, and that too when those duties are intermingled with and
form a part of the same system of acts all of which were required
to be performed by the clerk of the County Commissioners' Court,
as in the case of the election laws; in changing the election
from the *vivâ voce* vote to the vote by ballot, it was found neces-
sary to change the law, in relation to the election returns and

canvassing the votes; and hence we see the 24th section of the old .election law was repealed and the 19th section of the new law passed in its stead, which section provides that the returns shall be made to the clerk of the County Court, who shall proceed to open, canvass, and publish the return from each precinct, township, or place, as is provided by law." Now it will hardly be believed that the legislature would have required the new clerk to have performed this portion of the *ex officio* duties relating to elections, which was formerly imposed upon the old clerk, if they had not intended also that he should succeed to the other duties constituting a part of the same system; and yet they have nowhere in express terms declared that he should, and for the simple reason that they understood and intended that the new clerk should be in all respects the successor of the old, and as such successor was bound to perform all those ministerial acts which previously had been required of the clerk of the County Commissioners' Court. Many similar indications are to be met with in the revenue laws passed since the adoption of the new Constitution; and yet nowhere is the clerk of the County Court required to perform any of those ministerial duties formerly required of the clerk of the County Commissioners' Court, except where some change has been made in relation to them, or some new duty of a similar character has been imposed, when it has become necessary to repeat or designate the officer who should perform them. Take, for instance, the 5th section of the revenue law approved on the same day of the approval of the law organizing the County Court. In that section a new provision is made for the redemption of land sold to the State for taxes, and it is provided that the redemption shall be made to the clerk of the County Court, while that and the revenue law, passed four days before, are entirely silent as to whom redemption shall be made in other cases. . Indeed so identical were the clerks of the County Court and the clerks of the County Commissioners' Court considered by the legislature, that they are mentioned almost indiscriminately in both these revenue laws, when duties are required to be performed by the county clerk in their execution. The statute fixing fees of clerks of the county courts, which was also approved on the 12th of February, 1849, shows that the legislature intended that they should succeed to those

various *ex officio* duties of the clerks of the county commissioners' courts. It provides for them the following fees: "For each license and taking bond, for each ferry, toll-bridge, turnpike-road, tavern, grocery, or pedler, one dollar; for each marriage license fifty cents; for recording marriage certificate ten cents; each copy of rates of ferry, toll-bridge, or turnpikeroad, twenty-five cents;" "for taking depositions and certifying the same for every one hundred words, ten cents; for taking and certifying the acknowledgment of a deed, power of attorney, or other writing, and sealing the same, twenty-five cents; for taking proof in case of estrays and granting certificate of the same, twenty-five cents; for registering each certificate transmitted to him by a justice of the peace in case of estrays, ten cents; for advertising in each case, including a copy of the newspaper publication, fifty cents; for trying and sealing weights and measures, by the county standard, fifteen cents," &c. Now these are all *ex officio* duties imposed by former laws upon clerks of the county commissioners' courts, and it is manifest that the legislature did not in this law intend, originally to confer upon the clerks of the county courts, power to perform the acts, but fixed the fees, for the reason that they had by the law creating the county courts, made them the successors in all things of the clerks of the county commissioners' courts, and thereby authorized them to perform these duties. While these acts, to which I have referred for the purpose of showing the intention of the legislature, were not designed to and may not of themselves make the new clerk the successor of the old one, even in reference to the duties thus specifically recognized, they serve to show what was the intention of the legislature in passing another law at the same time and in *pari materiâ* with them.

But I will not pursue further an examination which has already become tedious, of those laws which are in *pari materiâ* with the law creating the County Court, but will content myself with a single further reference to the latter act, by which alone the clerk of the County Court is made the successor of the clerk of the County Commissioners' Court, and is thereby authorized to perform those *ex officio* duties, which had been conferred upon the last mentioned clerk, if he has such power. That act not only provides for the election of county judges, and county

clerks, but it also provides for the election of justices of the peace and constables, in place of the old ones theretofore existing; and the last section declares as follows: ". On the first Monday of December, eighteen hundred and forty-nine, the county judges, clerks of the county courts, justices of the peace, and constables provided for in this act, shall enter upon the duties of their respective offices, and on said day the term of office of the county commissioners, clerks of the county commissioners' courts, probate justices of the peace, justices of the peace, and constables, then in office, shall expire; provided that the justices of the peace, constables, county commissioners, clerks of the county commissioners' courts, and probate justices of the peace, who shall be in office on the first Monday in August next, shall continue in office until the first Monday in December next, and until the justices of the peace, county judges, and clerks of the county courts, provided for in this act shall respectively be elected and qualified." This section indicates, as clearly as it could be done without an express provision to that effect, that it was the intention of the legislature that the new officers to be elected should succeed to, and supply the places of, the old ones, who were to go out of office at the same time that the new ones came in. To hold this, certainly requires no forced construction of the law, and above all does no violence to, but is in perfect harmony with, the evident legislative intention. The records and books of the old justices of the peace were no doubt designed to be transferred to their successors, and so of the courts and clerks. Suppose, for some cause, that a county clerk was not elected and qualified on the first Monday in December, 1849, then the old clerk continued in the exercise of all his functions and duties till a new county clerk was elected and qualified, who would then take his place and succeed to all those functions and duties. It is true the legislature has not said so in express terms; but if there ever was a case where the court was authorized by construction to hold the law to be what the legislature most manifestly designed it should be, this is that case. It is the undoubted duty of the court sometimes to look at consequences in construing statutes, for the legislature must be supposed to have had consequences in view in passing it. Now it is out of

the question to suppose that the legislature, in the enactment of this law, ever designed to destroy the means of carrying out all these various laws, the execution of which depended upon the performance of those *ex officio* duties of the clerks of the county commissioners' courts, and thus in effect destroy the license laws, prevent the issuing of marriage licenses, interrupt the execution of the revenue laws, and destroy the right to redeem land sold for taxes, prevent elections in the mode prescribed by law, and, in fine, interrupt and almost annihilate the government itself. Such was never the design of the legislature, and to consequences such as these it is the duty of the court to look, before we give a construction to the law which would produce such results. Although it is to be regretted that the legislature has not, by express and plain enactment, superseded the necessity of construction, in a matter so important in its results, yet this court will not in such a case hesitate to declare the law to be what the legislature most palpably intended it should be. This is not the case where the legislature merely suppose the law to be one way, and legislate upon that hypothesis, when it is in fact the other way, but it is affirmative legislation, where we are seeking to find out what the affirmative will of the legislature was; and in such a case, when that will is clearly ascertained, we then know what the law which they have enacted is, and it becomes as much the duty of the court so to declare it, as if it had been expressed in the most positive and unequivocal terms.

We hold, then, that the clerks of the county courts are the proper successors of the late clerks of the county commissioners' courts, and as such are vested with the powers and duties conferred or imposed by former laws upon those clerks; and among those powers and duties are those of receiving and filing notices of agents of foreign insurance companies, and receiving and paying into the State treasury the three per cent. on the amount of premiums charged by such agents. The declaration we hold to be sufficient, and the court erred in sustaining the demurrer to it.

The judgment is reversed and the cause remanded.

*Judgment reversed.*