THE CHICAGO PACKING AND PROVISION COMPANY

*v.*

THE CITY OF CHICAGO.

| 88 | 221 |
| 124 | 361 |
| 124 | 362, |
| 88 | 221 |
| 159 | 291 |
| 88 | 221 |
| 172 | 220 |
| 88 | 221 |
| 175 | 454 |
| 176 | 347 |
| 88 | 221 |
| 88a | 321 |
| 88 | 221 |
| 199 | 4523 |

1. MUNICIPAL CORPORATION—*law of* 1872 *construed.* The general law of 1872, for the incorporation and government of cities, etc., is to be construed as an independent act, without reference to, or as an amendment of, any particular charter of any city or village. It was intended to apply to all cities which might adopt the same.

2. SAME—*power to license packing houses, etc.* The 81st clause of section 62 of the general law, giving cities and villages the power to direct the location and *regulate* the management and construction of packing houses, etc., within their limits, and to the distance of one mile beyond, confers the power to license such establishments, as one means of regulating the same. The means of regulating and controlling such houses is left to each particular municipality, so that the method is reasonable and proper.

3. The fact that a packing house has been licensed by the town of Lake, where it is located, but within one mile of the corporate limits of the city of

Chicago, does not exempt the same from an ordinance of that city requiring it to be licensed by that municipality. The person or corporation using the establishment is liable to be charged a license by both the city and village.

4. SAME—*police powers may extend beyond corporate limits.* The legislature may, for police purposes, prescribe the limits of municipal bodies, enlarging or contracting them at pleasure, and give them power to pass ordinances to prevent nuisances, to operate beyond their boundaries.

APPEAL from the Criminal Court of Cook county; the Hon. W. K. McALLISTER, Judge, presiding.

Messrs. HITCHCOCK, DUPEE & JUDAH, for the appellant.

Mr. RICHARD S. TUTHILL, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The city of Chicago adopted an ordinance prohibiting any person, company or corporation within the city, or within one mile of the city limits, from engaging in the business of slaughtering animals for food or packing them for market, or rendering the offal, fat, bones or scraps thereof, or any dead animal matter whatever, or to manufacture fertilizers or glue, or the cleaning or rendering intestines, until they shall have obtained a license therefor. The second section prescribes the mode of applying for and the granting of such licenses, and fixes the sum to be paid therefor at $100 per annum. The fourth section prescribes penalties for a violation of the ordinance, and empowers the mayor to revoke the license on conviction of the person for a breach of the ordinance.

The case was tried in the court below, on an appeal from a police magistrate, on a stipulation as to the facts.

It was agreed, that defendant was a corporation organized and doing business under the laws of this State, and when the suit was instituted against the company it was engaged in carrying on the kind of business mentioned in the ordinance. Its factory was in Cook county, outside of the city limits of Chicago, but within one mile of its limits, and within the town of Lake, in that county, and it then had a license from

the town of Lake for carrying on the kinds of business which it was engaged in at the time, but had not applied for or received license therefor from the city of Chicago.

On this agreed state of facts, the court below fined defendant $25 and costs, and it appeals to this court, and urges in favor of a reversal, that, for various reasons, the city had no power to pass or enforce the ordinance, and that the judgment is, therefore, unwarranted.

It is urged, that by the charter of 1872, under which the city is organized, there is found no authority to require a license to pursue this character of business. On the other hand, it is claimed that the 62d section of the general charter, by clauses 75, 78, 81 and 83, confers the power. The ordinance is manifestly framed under the 81st clause of that section, and the other clauses can not be invoked to sustain an ordinance until it shall be adopted to give force to their provisions, hence we will not consider what power they confer.

Appellant contends, that in conferring police power by the act of 1872, it must be regarded as a revision of the city charter of 1867. It will be observed that this act was not adopted for the city of Chicago, but for all cities and villages of the State that might organize under or adopt it as the fundamental law of their organization, and the sole source of their power. The General Assembly did not, nor could it, know that the city of Chicago would ever adopt the act as its charter. We have no right to presume, when the act was adopted its framers had the old charter of the city in their minds, as they would had they been amending the charter under which it was then acting. They, no doubt, considered the question as to what power might be necessary to enable it to secure the people of that city, as well as all other cities, in all of their rights as municipalities. The act being adopted not for Chicago, but for all cities adopting it, we should, in construing it, not look to the special charters of small municipalities having 1000 inhabitants or upwards, to give a construction to the general law. If we should, then a village charter would be as potent,

after it became a city, in ascertaining its meaning, as the charter of Chicago; but the general law must be regarded and construed as an independent act, without reference to, or as an amendment of, all the special city and village charters of the State. This being true, the fact that the city charter of 1867 empowered the municipality, in terms, to license this character of establishments, and the general law has omitted those express terms, can have no bearing on the construction that shall be given to this latter act.

The 81st clause of the 62d section of the general law is this: "To direct the location and regulate the management and construction of packing houses, renderies, tallow chandleries, bone factories, soap factories and tanneries within the city or village, and within the distance of one mile without the city or village limits." Does this clause, then, confer power upon cities and villages to license these establishments? The General Assembly, by this enactment, assumes and virtually declares that this character of business in or near to cities and villages is noxious to the health or comfort, or both, of their dense population. And this is so certainly true, that it is believed the great mass of civilized people know it, from experience or observation. The very character and inherent nature of the business are such that the employment of most approved plans and best precautionary means is believed to be inadequate to entirely prevent these establishments from being offensive in thickly settled districts. Hence, the General Assembly, acting on this assumption, has conferred upon cities and villages this broad and comprehensive power over this character of business, and it seems to be manifest that they intended to invest these bodies with ample power to regulate and control not only their management, but even the places of their location. Under this clause, a person or corporation can not even erect, at any given place, such an establishment, without the license or permission of the city or village first obtained for the purpose, whenever they see proper to exercise the power to direct its location.

The General Assembly, no doubt, in granting this power to cities and villages, deemed it wise to make it more ample, by not specifying the means they should employ to accomplish the purpose, and no doubt intended to make the power complete. Had the mode of accomplishing the end been specifically prescribed, in many of these bodies it might have proved impracticable, and the purpose been defeated. Hence we must conclude, as they were legislating for a large number of such bodies differently situated, differing in population, wealth and situation, and many other important particulars, in conferring such powers, if their exercise had been specifically prescribed, it would probably have been found, that whilst the prescribed mode of its exercise would have been eminently well adapted to some cities and villages, it might be entirely unsuited to others. The legislature, therefore, have deemed it proper to provide that the bodies may control their location and regulate their management, leaving it to each municipality to adopt the means.

Then, does the power to regulate the management include the power to prescribe their duties, and require them to obtain a license to pursue their business on the prescribed terms? We are clearly of opinion that the power to require a license is one of the means of regulating the exercise or pursuit of this business. There are, no doubt, a great variety of other means that might be adopted to accomplish the purpose, but these municipalities are not restricted as to the means they shall employ to regulate the business. In the various illustrations of the meaning of the word "regulate," we find, among others: "To direct; to rule; to govern; to conduct." As the language is used in reference to the power of a city or village government, we must suppose it was intended to mean that such bodies might rule or govern ·this character of business.

In the case of *The Town of Mt. Carmel* v. *Wabash County*, 50 Ill. 69, it was held, that the general grant of power to an incorporated town to tax, restrain and suppress tippling

houses, embraced the power to license the sale of liquor. The word "restrain" is not more comprehensive than "regulate." The former term is usually employed to signify to hold back, to curb, to hold in, to check, to prevent, to hinder, and to that extent it may mean to govern. But the power to regulate is surely as comprehensive as to restrain, and would seem to embrace the power to employ more and different means. It, no doubt, embraces the power to restrain by the same methods of restraint, and if a license may be required as a means of restraint, we have no hesitation in saying that it may be as a means of regulation. We are, therefore, clearly of opinion that the power is conferred to require the license in this case, under the 81st clause of the 62d section of the general law.

It is urged, that these establishments may be regulated effectually without requiring them to procure a license. This is no doubt true, but, conceding it, it does not follow that such a license may not be required as one of the unrestricted means cities and villages are empowered to employ for the purpose. Had those other means been enumerated in the charter, then, it may be, there would be force in the argument. But these bodies are empowered to use all legal, reasonable and proper means to regulate this business, and we have seen that to require them to procure a license, and to submit to the ordinance regulating them, is one of the means sanctioned by the act.

In the cases of *The People* v. *Thurber*, 13 Ill. 554, and *City of East St. Louis* v. *Wehrung*, 46 Ill. 392, it was held, that the fee required to be paid a city for granting a license to sell liquor, or to act as an agent of a foreign insurance company, is not a tax, in the constitutional sense of that term, and is not governed by the requirements of the organic law in levying and collecting ordinary taxes. Hence, no question of that character can arise in this case.

But it is urged, that the establishment of appellant is within the corporate limits of Lake, and it has a license from that municipality to pursue its business, and the city of Chicago is,

therefore, powerless to assume control over the business of appellant or the establishment in which it is done. There can be no doubt that the General Assembly may, for police purposes, prescribe the limits of municipal bodies. It may enlarge or contract them at pleasure, and may define the limits within which their general powers may be exercised, and extend or limit the boundaries in which special powers may be performed. Under the general law the limits prescribed by special charters of cities and villages are recognized as still existing, and within which they may exercise their general powers; but, in addition thereto, this act has, for specified purposes, enlarged those boundaries one mile in every direction from the city or village limits proper, and the legislature has the power to increase those limits, even though they may lap over territory in the limits of other municipalities. As to the possession of this power there is no question, otherwise it would not have legislative powers essential to government, nor is there any restriction on the power. Having the power, did they exercise it by this enactment? We can see many weighty reasons for exercising it. The town of Lake, under its charter, is, in its limits, co-extensive with the congressional township. It is vested, by its charter, with powers usually confined to cities and villages. But did the General Assembly intend that so extensive a municipality territorially, and not populated as a city, might, on its border adjoining the city of Chicago, license establishments not at all inconvenient or injurious to its less dense population, but intolerable nuisances to the dense population of the city? Did they intend that the city should be annoyed and injured in health and comfort by the exercise of the power of a corporation with a comparatively sparse population, and to submit to have imposed on them such nuisances as the town of Lake might impose by licensing them? We can not suppose the General Assembly so disregardful of the health and comfort of such great numbers of people, but, on the contrary, we must suppose it was intended that the people of Chicago, and other cities under like circum-

stances, should have the means of protecting themselves against such intolerable wrongs as might thus be inflicted upon them. We must conclude that the General Assembly, rather than subject our large cities to such hazards from smaller municipalities in their immediate vicinity, would have repealed the charters of the latter, or at least have curtailed their power.

Whilst it is extremely difficult, in large and crowded cities, with their various commercial, manufacturing and other pursuits clashing each with the other, to so adjust the laws as to alike protect every right and interest, all must, to some extent, have his rights restricted for the benefit of all its people. What in an open or thinly settled country would be innoxious as a business, would in the heart of a city be a terrible nuisance, producing death, destroying property, and highly injurious to health and destructive to comfort. Persons, then, desiring to engage in particular avocations in or near to cities, must submit to have their pursuits limited and controlled, at least so far as the preservation of health, and to a reasonable extent the comfort, of the people may require, nor can the inhabitants of a city expect to be free from the tainted atmosphere produced by a thousand causes that do not exist in the country or in places less densely peopled.

Whilst trade, manufactures and commerce have large claims on the law for protection, theirs are not the only, nor are they the highest, claims. The lives, the health and the comfort of the people are the highest, and demand the first and greatest protection. Yet, in a great city like Chicago, which may, no doubt justly, claim to be the greatest cattle and hog market and the greatest meat packing mart in the world, the people can not expect to breathe the air as pure and invigorating as in the open country ; but they do have the right to be protected against all kinds of business that endanger life and health, and from intolerable nuisances that destroy their comfort. To accomplish this purpose, the power was conferred upon cities and villages to regulate these establishments for the distance of one mile beyond their corporate limits, even if that

should lap over and embrace a portion of territory included in the boundaries of another municipality. Each, to that extent, has the right to protect its inhabitants, and such establishments, located in such territory, are subject to the police power of both corporate bodies. This is within the letter, and, we have no doubt, the spirit of the law. Nor does the fact that appellant is liable to pay a fee to each municipality for the privilege of pursuing a vocation the General Assembly regards of such a character as to require regulation and control, militate against the grant or exercise of the power.

The finding of the court below was required by the admitted facts of the case, and the judgment is affirmed.

*Judgment affirmed.*