Oket, C. J.
The question in this case is whether the act of April 5, 1882 (79 Ohio Laws, 66), “ more effectually to provide against the evils resulting from the traffic in intoxicating liquors,” is in conflict or in harmony with art. 15, § 9, of the constitution (Schedule, § 18), which is as follows: “ No license to traffic in intoxicating liquors shall hereafter be granted in this state, but the general assembly may, by law, provide against evils resulting therefrom.” In the decision of tíauses in this court, the most important and delicate duty of a judge is the determination of such a question. While it is now universally conceded that this court is clothed with power, and imperatively required to determine that an act is void, if it is in conflict with the constitution, it is equally well settled that the presumption is in favor of the validity of every act, and that no judge is warranted in holding a statute to be in conflict with the constitution, until he has given to the question of its validity most careful consideration, and is able to show in what respect there is such conflict, and that it is irreconcilable. To hold a legislative enactment to be void, where it is not plainly in conflict with the organic law, is as clearly unwarranted as to circumvent or nullify a plain constitutional inhibition by holding that the identical thing inhibited may be done under another name. Guided by these principles, we have bestowed upon the question before us that care which its acknowledged importance .demanded.
At common law the traffic in intoxicating liquors was a lawful business. See remarks of Botnton, J., in Baker v. Beckwith, 29 Ohio St. 314, 319; Yaple, J., in Granger v. Knipper, 2 Superior Court Rep. 480. And there is nothing in the federal or state constitution which changes the rule. But the right to provide against the evils resulting from the traffic in intoxicating liquors is asserted in our constitution in the words already quoted. The origin of statutes licensing the sale of liquors is found, it is said, in 5 & 6 Edward VI. *220 c. 25, which statute was enacted more than three centuries ago. 5 Reeves’ His. Eng. L. 36. The history of the legislation, English and American, upon this subject, is very instructive, but I have not time or space to enter fully upon it here. It is sufficient for the present purpose to show the condition of the law upon this subject at the time the constitution of 1851 was adopted by the convention which framed it. The act of 1831 (2 Swan & Cr. 1426), “ granting licenses and regulating taverns,” was then in force, and the license therein provided for was a license to retail intoxicating liquors as well as to keep a tavern. Hirn v. The State, 1 Ohio St. 15. That act provided how application should be made to the court of common pleas for such license, what notice of the application should be given, and what evidence might be offered on the hearing of the application. When satisfied that the proper notice had been given, that the applicant was a person of good moral character, that he was provided with suitable accommodations, that such tavern was needed, and that the applicant was a suitable person to keep the same, the court was authorized to grant such license for one year. In 1847, it was provided that the word “ authorized ” should be construed to mean required, and that act was subsequently repealed. 2 Ourwen, 1341, § 10. The act of 1831 further provided, “ That the court granting the license shall fix the price thereof, which shall not be more than $50, nor less than $5 per annum, having proper regard to the applicant’s situation for business.” On payment into the treasury of the sum fixed, and payment of a fee of fifty cents to the clerk of the court granting the license, he issued to the applicant a paper, under the seal of the court, called a license. The act further provided, “ That if any person shall keep a tavern or retail spirituous liquor, or shall vend or sell any spirituous liquors of any kind to be drank at the place where sold, or shall vend or sell such spirituous liquors by' less quantity than one quart, without being duly licensed as a keeper of such tavern,” he shall be fined not exceeding $100, nor less than $5, on conviction upon indictment. But it will be seen that under that act any person could, without license, lawfully sell liquors of any sort, in any quantity *221 not less than one quart, if the liquor was not to be drank where sold. And it was further provided (2 S. & C. 1430), that if such tavern-keeper permitted any kind of rioting, reveling, intoxication or drunkenness on his premises, he should be indicted and fined, and his license should be revoked. The act of 1831 was repealed, so far as it authorized a license to" traffic in liquors, by the act of March 12, 1851 (Hirn v. The State, supra), and in the absence of such repeal it would have been, in that particular, abrogated by the constitutional provision under consideration.
From the fact that the framers of the constitution must have had in their minds the license law then in force, it is argued that the constitutional inhibition under consideration is directed against licenses so granted and issued, and none other. But we think such a construction of the organic law wholly inadmissible. “Particular cases or instances,” said Gholson, J., in Goshorn v. Purcell, 11 Ohio St. 641, 649, “ lead to the adoption of general rules of principles. Many of the general rules of law are thus deduced from the decision of particular cases. But when particular instances lead to the adoption of a general rule in the shape of a legislative or constitutional provision, the authority for the rule has no such limit. The rule is to be interpreted from the language employed in its enunciation, and that language, when clear and comprehensive, is not to be limited in view of the particular instances which may be supposed to have led to the adoption of the rule.” Clearly this inhibition of the constitution applies to all departments of the government, and restrains the legislature from granting licenses for such purpose, whatever form of legislation may be adopted. If more direct authority for such construction could be thought necessary, it may be found in The People v. Thurber, 13 Ill. 554. It was said in that case, “ the law itself is the license.” Moreover, if there had been any force in such objection, it would have been suggested in Youngblood v. Sexton, 32 Mich. 406; s. c., 12 Albany L. Jour. 265; 2 Central L. Jour. 700 ; 20 Am. Reps. 654, where the whole subject was elaborately considered.
We come, then, to consider as to the condition of the law *222 on April 5,1882, when the act under consideration was passed. At that time it was an offense, punishable by fine or imprisonment, to sell to any person alcoholic liquors to be drunk at the place where sold, or to sell intoxicating liquors of any kind to a person intoxicated or in the habit of getting intoxicated, or to a minor without the written order of his parent, guardian or family physician (77 Ohio Laws, 58), or to sell spirituous liquors on Sunday, except upon the written prescription of a practicing physician (78 Ohio Laws, 126); and there were some other restraints upon sales at particular places (Rev. Stats. § 6945) or at particular times (Rev. Stats. § 6948). But, except as restrained by the statutes above referred to, and valid ordinances of municipal corporations, the traffic was, as we have seen, entirely lawful. Hence, at the time the act in question was passed, it was clearly lawful to sell to an adult who was sober, and not in the habit of becoming intoxicated, wine manufactured from the pure juice of the grape cultivated in this state, or beer, ale or cider, to be drunk at the place where sold or elsewhere; it was lawful to sell to such person any sort of intoxicating liquor, in any quantity, where such liquor was not to be drunk at the place where sold ; and it was lawful to sell liquor of any. sort, in any quantity, even to a minor, if he produced the written order of his parent, guardian or family physician. Undoubtedly, one who conducted such business in a lawful manner was entitled, under the law as it then existed, to the same protection which was accorded to dealers in other articles of personal property; the state law required that he should be taxed, in addition to the sum exacted by the general government, in the same way as a grocer or like dealer, and not otherwise; and he was not required to give bond or pay money under the state law, as a condition upon which he might deal in liquors. Whether this condition"of the law was just or unjust, wise or the reverse, is not a matter submitted for our consideration nor is any such question submitted to us in determining as to the validity of the statute under consideration. I am simply stating what was the condition of the law of this state on April 5, 1882, and in what condition it *223 would have remained, if the statute enacted on that day, being the act under consideration, had not been passed.
The act of April 5, 1882, which took effect from and after May 1, 1882, provides, among other things, that each person engaged in the traffic in intoxicating liquors shall, within thirty days after the act takes effect, and each person engaging in such traffic after May 1, 1882, shall, before engaging in such traffic, execute a bond to the state, to be approved by the probate judge, in the sum of $1,000, “ with at least two sureties, resident of the county, and each owning therein freehold estate, not exempt from execution, worth at least double the amount of the bond above incumbrances,” “ which bond shall be conditioned for the faithful performance of all and singular the requirements of this act.” And at the time the bond is given, and annually thereafter in the first week in May, such dealer shall, “ during his continuance in such traffic, pajr into the treasury of the proper county, upon the certificate of the county auditor,” not less than $100, nor more than $300, the amount being determined, according to the provisions of the act, by the place of business of the dealer. If the dealer giving such bond fail to make any such payment, he shall be deemed to have broken the condition of his bond, in an action to be brought thereon in the court of common pleas. If a person engage or continue in such traffic after his bond shall have been thus adjudged to be forfeited, or without having executed such bond, he “ shall be deemed guilty of a misdemeanor, upon conviction of which, he shall be fined in any sum not exceeding $1000, nor less than $500, or be imprisoned in the county jail not exceeding one year nor less than thirty days, or both, at the discretion of the court.” Moreover, in such case of failure to comply with the act, the traffic is in terms referred to as an “illegal traffic.” A sale of liquors to one illegally engaged in the traffic, is made punishable by fine not exceeding $2,000, nor less than $200, or imprisonment not exceeding one year nor less than thirty days. Besides, a person giving such bond, who engages or continues in such traffic after default in making any such payment into the county treasury, is, with *224 his sureties, made liable on such bond for double the amount of such default.
The act under consideration provides, that “the use and sale of intoxicating liquors, in good faith, for purely medicinal purposes, by lawfully authorized physicians in their regular practice, or of pure alcohol for mechanical purposes, or of other intoxicating liquors by druggists, upon a written order or prescription of such physician for such purposes, shall not be deemed traffic within the meaning of this act.” But with this exception, the act is as to all persons then engaged or thereafter engaging in the traffic in liquors, who fail to comply with its terms, a stringent prohibitory liquor law. If such person fail to give bond, as required by the act,-he becomes a criminal by continuing in the traffic. So if, having given the bond, he continue in the traffic without paying money into the treasury as required by the act, his bond is declared forfeited and he becomes equally a criminal. It is, in other words, whei’e the person engaged or engaging in the traffic fails to comply with the statute in the way stated, impossible for him to carry on such traffic, or sell intoxicating liquors of any sort, without committing a crime. But dealers in liquors who execute bonds and pay into the treasury, in advance, annual sums of money, as stipulated in the act, acquire a privilege of freely trafficking in intoxicating liquors, with the restrictions and exceptions mentioned, to the exclusion of all other dealers.
It is conceded that the privilege granted by the act under consideration is not in the ordinary form of a license. It is also true, that the provisions of the statute are so arranged, and of such peculiar form, that their real meaning is not readily perceived. But it is our duty to look through the collocation of words, whatever the form, to the operation and effect of the statute, and determine from that whether it is within the constitutional inhibition. Remarks' bearing upon this subject will be found in cases already referred to, but the observations of White, C. J., in the District Court Case, 34 Ohio St. 431, 440, are more pertinent. “ The constitution,” said he, “ must be interpreted and effect given to it as the paramount law of *225 the land, equally obligatory upon the legislature as upon other departments of the government and individual citizens, aceordto the spirit and intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although it may not be within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in terms forbidden.” And see Monroe v. Collins, 17 Ohio St. 665; Walker v. Cincinnati, 21 Ohio St. 14, 53; Eichenlaub v. The State, 36 Ohio St. 140. The doctrine so enunciated we take this occasion to re-affirm, in applying it to the statute under consideration.
The power to license certain classes of business, impose a charge therefor in the form ,of a tax, and enforce the payment of the tax as a condition precedent to the lawful prosecution of the business, is well settled. Mays v. Cincinnati, 1 Ohio St. 268; Baker v. Cincinnati, 11 Ohio St. 534; Cincinnati Gas Co. v. The State, 18 Ohio St. 237; Telegraph Co. v. Mayer, 28 Ohio St. 521. This relates only to employments which, in one form or another, impose burdens upon the public. Such tax cannot be imposed merely for general revenue, for the only mode of raising such revenue, whether for state, county, township, or municipal corporation purposes, is found in the twelfth article of the constitution (Ranney, C. J., in Hill v. Higdon, Zanesville v. Richards, 5 Ohio St. 243, 589; 18 Ohio St. 237; 31 Ohio St. 329); and as Gholson, J., remarked in Baker v. Cincinnati, supra, “ it could not be employed as a mode of taxing property, without reference to the uniformity and equality required in section two, of article twelve, of the constitution.” That eminent judge also made this remark with reference to the license under consideration in that case, indicating the nature of and limit to such taxation: “ The burden thus devolved on public officials, requiring, perhaps, an increase in their number and compensation, for the benefit of exhibitors of shows or performances, may justly authorize a charge beyond the mere expense of filling up a blank license.” *226 With, respect to the traffic in liquors, however, the power to license is, as we have seen, in terms denied ; but in relation to such traffic, express power is granted to “ provide against evils resulting therefrom.” See remarks of Thurman, C. J., in relation thereto, in Miller v. The State, 3 Ohio St. 475.
What, then, is a license % In a general sense, a license is permission granted by some competent authority to do an act which, without such permission, would be illegal. In Home Ins. Co. v. Augusta, 50 Geo. 530, the judge delivering the opinion, in speaking of the distinction between a license and a tax, said: “ There is a clear distinction recognized between a license granted or required as a condition precedent before a certain thing can be done, and a tax assessed on the business which that license may authorize one to engage in. 42 Geo. 596. A license is a right granted by some competent authority to do an act which, without such license, would be illegal. A tax is a rate or sum of money assessed on the person, property, &c. of the citizen. Bouv. L. D.; 36 Geo. 460. A license is issued under the police power of the authority which grants it. If the fee required for the license is intended for revenue, its exaction is an exercise of the power of taxation. Cooley’s Const. Lim. 201.” In the decision of that case on error (93 U. S. 116, 123), Swayne, J., refers to the power to tax and to license, but he does not intimate, as has been supposed, that there is no distinction between a tax and a license, based on a difference in their effect on a business. It is quite sufficient to say of the case there under review and the case to which the judge refers, that the ordinance and legislation under consideration were different from the legislation involved here, and that the power of the legislative body and the court was not restrained in any of those cases by a constitutional provision like that which controls this case. And we find that the revenue acts of Congress and the decisions of the supreme court of United States, referred to by the counsel for the relator, shed no light on the question before us.
In Youngblood v. Sexton, supra, the question was whether a sum imposed by a statute of Michigan on a dealer in intoxicat *227 ing liquors, was a tax on the business, or an exaction for a license, and hence within a constitutional provision prohibiting the granting of a license for such purpose. The court held it to be a tax and not a license, and in delivering the opinion, Cooley, J., said: “ The popular understanding of the word Ícense undoubtedly is a permission to do something which without the license would not be allowable. This we are to suppose was the sense in which it was made use of in the constitution ; but this is also the legal meaning. The object of a license, says Mr. Justice Manning, is to confer a right that does not exist without a license. Chilvers v. People, 11 Mich. 43, 49. Within this definition a mere tax upon the traffic cannot be a license of the traffic, unless the tax confers some right to carry on the traffic which otherwise would not have existed. We do not understand that such, is the case here. The very act which imposed this tax repealed the previous law, which forbade the traffic and declared it illegal. The trade than became lawful, whether taxed or not; and this law in imposing the tax did not declare the trade illegal in case the tax was not paid. So far as we can perceive, a failure to pay the tax no more renders the trade illegal than would a like failure of a farmer to pay the tax on his farm render its cultivation illegal. The state has imposed the tax in each case, and made such provision as has been deemed needful to insure its payment ; but it has not seen fit to make the failure to pay a forfeiture of the right to pursue the calling. If the tax is paid, the traffic is lawful; but if not paid the traffic is equally lawful. There is consequently nothing in the case that appears to be in the nature of a license. The state has provided for the taxaction of a business which was found in existence, and the carrying on of which it no longer prohibits, and that is all.” And in Pleuler v. The State, 11 Nebraska, 547, where a similar question arose, under a statute of Nebraska, and the exaction was held to be a license, Youngblood v. Sexton was cited, the definition of a license which it contains was stated, and the court added: “ Within this definition, a mere tax upon the traffic, unless its payment confers some right that otherwise would not have existed, can in no sense *228 be properly called a license.” Hence, the distinction between the act under consideration in the case before us, and the Michigan statute, is very plain. Non-compliance with the Michigan statute did not render the traffic illegal, and compliance with it gave a dealer no privilege over another dealer who failed in such compliance; but one who carries on the traffic under the Ohio statute, without complying with its provisions, commits a criminal offense, while a dealer who complies with it obtains privileges denied to others.
An effort has been made to show that the penal provisions of the statute simply provide a mode of collecting a tax, and moreover, that giving the bond and paying the money is simply the performance of a condition upon which business may be done, the conditions, it is said, not being different in principle from regulations as to the days and times of closing the place of business, putting in or- removing screens, or the like. But we think the provisions of this statute are of a very different character. They impose, as we have seen, conditions precedent to the lawful prosecution of such business. Noncompliance with the statute renders its prosecution, to any extent wholly illegal; and hence, the act falls within the definition of a license law stated in the cases to which I have refered. No unrestricted license to traffic in intoxicating liquors has ever been granted in this state; and the restrictions and conditions imposed by this statute and the acts in connection with which it must be construed, in no way affect the character of the privilege granted, or render it anything else than a license. So, it is objected that there is no provision that a dealer shall be a person of good character ; but character is not a necessary element in a license. Whether it is in effect the grant of a license, and therefore inhibited, must be determined from the whole act. The constitutionality of a statute depends upon its operation and effect, and not upon the form it may be made to assume. This statute, in its title, is an act to provide against evils resulting from the traffic. In form, it requires the payment of money and the execution of a bond, and provides that certain consequences shall follow in case a dealer in liquors fails to comply with the act. In substance, it is, as to all *229 dealers who fail to comply with its provisions, a stringent prohibitory liquor law, and as to all dealers who do so comply, it grants the privilege in the future to deal in such liquors, to the extent not prohibited by previously existing laws. In legal effect, it is an act granting to those who comply with its provisions, licenses to traffic in intoxicating liquors, to the exclusion of all other dealers, and hence it is in conflict with the constitutional provision under consideration. Though not called a license law, it authorizes the granting of that which in effect is as clearly a license as the privilege granted under the act of 1831. The quality of a thing is not altered by changing its name; and the special privilege to traffic in liquors which is conferred under this act, is as plainly a license as if it had been in terms so called. What would constitute a license law within the constitutional inhibition, and in what respect would such a law differ, in its operation and effect, from the act under con-^ sideration, construed, as that act must be, in connection with the statutes in force relating to intoxicating liquors ? This pertinent inquiry was made during the ai’gument of the cause, but no satisfactory answer has been given to the question, for the obvious reason that it is impossible to frame a statute which, in its operation and effect, would be more clearly a license law than the act under consideration. And it is proper to say on the question of constitutional power, that the giving or not giving the bond is not an essential matter. The bond is to secure the payment of the specified sums of money. The question of the constitutionality of the act would have been the same had the legislature not required the bond to be given, but had required the payment of the same sums for the privilege of engaging or-continuing in the traffic.
Attention has been directed to the fact that the statute in question provides, that nothing in this act shall “ be construed or held to authorize or license in any way the sale of intoxicating liquors.” No doubt the construction placed upon a statute by the legislature wdll in many cases have controlling weight. Schooner Aurora Borealis v. Dobbie, 17 Ohio, 125. But finding that this statute in its operation and effect is simply and only a license law, in violation of the constitutional inhibition, *230 the provision as to the manner in which the act shall be construed is wholly nugatory.
■ Finally, it is urged that even if the section providing punishment for non-compliance with the requirements of the statute, should be held to be unconstitutional, still that other parts of the act may stand. But as Blaekstone observes, “ the main strength and force of .a law consists in. the penalty annexed to it.” 1 Com. 57. It is not to be supposed that the legislature would have enacted this statute without such clause; and hence, the whole act fails. The State v. Perry Co., 5 Ohio St. 497.
Counsel for the defendants insist, furthermore, that the act is in conflict with various other provisions of the constitution. But the view adopted in this case renders it unnecessary to enter upon the examination of the questions so presented. On the other hand, counsel for the relator contend that, notwithstanding the inhibition against licensing such traffic, the business of a dealer in liquors may be taxed, and they rely on Youngblood v. Sexton, supra. But the question involved in that proposition is not before us for decision in this case. We have not considered that question with reference to any determination of it, and therefore we express no opinion upon it.
In reaching the conclusion that the act in question is a license law, and therefore void, the decision is not in conflict with any ease or authority to which our attention has been directed.

Writs refused.