## Thomas Chilvers v. The People.

The ordinance of the Common Council of Detroit which provides that no person shall keep a ferry or boat for transporting persons and property across to the Canada shore without a license therefor from the Mayor, and imposes a penalty for its violation, is a valid ordinance.

The city of Detroit may lawfully charge a license fee with a view to revenue for the keeping of such a ferry.

Such a license fee is a price paid for a franchise, and not a *tax* within the meaning of that term as used in the Constitution of the State and the charter of said city.

Nor is it a regulation of commerce within the meaning of the Constitution of the United States. And therefore persons keeping a boat for transporting persons and property from Detroit city to the opposite shore without such license, may be lawfully punished therefor under such ordinance notwithstanding the boat is enrolled and licensed for the coasting and foreign trade under the laws of the United States.

*Heard May 23d and 24th. Decided November 18th.*

Error to the Recorder's Court of Detroit, where plaintiff in error was convicted on a complaint for a violation of an ordinance of said city relative to ferries, approved July 24, 1861. The case was submitted in the Court below on the following stipulation as the sole evidence:

" *The People v. Thomas Chilvers.* It is hereby stipulated to be used in evidence on the trial of this case, that at the time mentioned in the complaint, the defendant was captain of the Gem, a steamboat used and employed in the business of carrying passengers and property from Detroit to Windsor in Canada, a village opposite to said city, and sometimes engaged in carrying passengers and property to Fort Wayne, in Wayne county, Michigan, in towing vessels, and in going to any part of the river where she may be hired to run.

That the Gem is a United States vessel, owned in the United States, and above the burden of twenty tons, enrolled and licensed for the coasting and foreign trade under and by virtue of the laws of the United States.

That the boundary between the United States and Canada is midway through the Detroit river.

That the Gem and her officers are subject to all the laws regulating customs, both in Canada and the United States; that by said laws they are obliged to report all goods transported at once to the Custom House Department, and only to discharge at such times and such places as said officers permit.

That a Custom House officer is on each dock, in Canada and Detroit, to see that the laws are enforced.

That the owners of said Gem pay $100 for the privilege of landing at a private wharf in said city, from now until the first of April next.

That said Gem carries the light required by the act of Congress, and that no license has been paid to said city since said ordinance was passed.

WM. J. SPEED, *City Attorney.*

JOHN S. NEWBERRY, *Att'y. for Deft.*

Nov. 8, 1861."

Upon this evidence, under the charge of the Court, the jury returned a verdict of guilty. Exceptions were taken to the rulings of the Recorder, but they are not

given here, as the questions arising upon them sufficiently appear by the opinions.

*Newberry & Pond*, for plaintiff in error:

The ordinance in question is not within the power of the Common Council, is unreasonable, and therefore void.

By law the Council has the power to "license, continue and regulate," &c. The power granted does not authorize the *prohibition*. When the Legislature wish to authorize the prohibition, they do so in express terms.

The license fee is a tax. It is not based upon any idea of benefit to the person taxed, and is therefore unjust: 2 *Mich.* 567. Corporations can not impose a burden without a benefit:—16 *Pick.* 125; 10 *Wend.* 102. It is unreasonable because in restraint of trade and business; because a private dock must still be paid for the privilege of landing; because no property of the city is used, and therefore no reason why the owner of a boat should pay a license merely for keeping it, any more than the owner of a steam engine, or other personal property; because the owner already pays a tax upon it as personal property; because unreasonably unequal, since a boat running to Canada ought no more to pay than one running to Wyandotte or Cleveland; because the paying of a license promotes in no manner the health or good morals of the people, and is not a reasonable exercise of the police power:—2 *Dutch.* 298.

2. The word *license* simply means *permission*, and the power to license does not import the power to exact a fee therefor:—2 *Halst.* 64; 3 *Strobh.* 599; 9 *Wheat.* 190, 213; 5 *Hill*, 211; 5 *Cow.* 462. A license fee is a tax: 31 *Penn. St.* 17; 3 *Ala.* 137; 12 *Wheat.* 419; 7 *How.* 408, 446, 458; 11 *G. & J.* 406. The charter giving power to levy a tax on property is equivalent to saying it shall not be levied on any thing else:—*Broom's Max.* 278; 33 *N. H.* 430; *A. & A. on Corp.* 177; 2 *Dutch.*

298; 2 *B. Monr.* 134. By the Constitution taxes are to be uniform, and levied upon *property.* It is therefore unconstitutional to exact a license tax.

3. The ordinance is in violation of the Constitution of the United States, which vests in Congress the sole power to regulate commerce with foreign nations : — 9 *Wheat.* 189 ; 7 *How.* 392 ; 14 *How.* 573 ; 3 *Cow.* 743 ; 14 *Pet.* 570 ; 5 *Wheat.* 23 ; 12 *Pet.* 446 ; 15 *Pet.* 511 ; 11 *Pet.* 158 ; 12 *Wheat.* 419 ; 3 *Strobh.* 599 ; 1 *Newb. Ad.* 551 ; 18 *How.* 429. The enrolment and license authorize the vessel to be employed in the foreign and coasting trade : — *Bright. Dig.* 143, § 22 ; 4 *Stat.* 487 ; 9 *Wheat.* 212 ; 6 *McLean,* 240 ; 3 *Cow.* 716 ; 32 *Me.* 362 ; 14 *How.* 575. And no State can retard, burden or limit the right thus conferred by Congress : — 12 *Wheat.* 447 ; 4 *McLean,* 293 ; 3 *Mich.* 235. And see 9 *Wheat.* 212–15 ; 1 *Humph.* 156 ; 4 *Hill,* 209.

*T. McEntee, City Attorney of Detroit,* for the People :

The right to grant a ferry franchise is a sovereign prerogative, always claimed and exercised by the States. It is a part of the police power of the States, never surrendered by them, nor claimed by the General Government : — 8 *How.* 569 ; 10 *How.* 533 ; 23 *How.* 435 ; 9 *Wheat.* 1.

The jurisdiction of the State extends to the center of the Detroit river. So far her power to regulate ferries can not be questioned : — 11 *Wend.* 586. It is not necessary that the State should control the landing on the Detroit shore : — 6 *B. & C.* 703 ; 11 *Wend.* 590.

Enrolment and registry are intended to confer on vesssels a national character for commercial purposes : — 9 *Wheat.* 1. They do not confer any exemption from the police regulations of the States. The license in this case is to be employed in the coasting or foreign trade. We concede that the right to regulate commerce includes the right to regulate navigation ; and that the transportation of passen-

gers falls within this power. But the conveyance of passengers from a foreign country to the United States, in the ordinary operations of foreign commerce, or their transportation from one State to another in the operations of a proper coasting trade, is a very different matter from the running of a ferry for carrying them.

The legislation of Congress and the decisions both of the State and National courts, lead to the same conclusion, that ferrying is viewed as distinct from commerce.  See 6 *Penn. L. J.* 132; 16 *B. Monr.* 799, 802; 9 *Wheat.* 203, 204; 11 *Wend.* 586; 16 *How.* 534.   Also 1 *Stat.* 305; *Bright. Dig.* 855, § 40.

The exercise of the right to engage in commerce, and the protection of that right under the Constitution of the United States, are subordinate to the right of the State to protect its property and enforce its police regulations; and this principle extends to cases other than those of ferries, which involve more fully and directly an apparent interference with the privileges claimed under licenses to vessels.   See cases of fisheries, 18 *How.* 74; 3 *Gray*, 271; State pilots, 12 *How.* 300; tax on passengers, 11 *Pet.* 102; 7 *How.* 283; erection of bridges, 6 *McLean*, 70; sale of liquors, 5 *How.* 504; lights in harbors, 21 *How.* 847.

The power to regulate commerce with foreign nations is the same as the power to do so among the several States.   Therefore if a State can not regulate ferries between her own shores and a foreign country, she can not between herself and another State.   But that she may in the latter case is settled by general usage, and recognized in 8 *How.* 569; 16 *How.* 525; 23 *How.* 433; 11 *Wend.* 590; 4 *Zab.* 206; 16 *B. Monr.* 699.

But if the power was in Congress, the States might exercise it until such time as Congress should pass some law on the subject:— 15 *B. Monr.* 699; 2 *Pet.* 245.

MANNING J.:

Chilvers, the plaintiff in error, was prosecuted in the Recorder's Court of the city of Detroit, under a city ordinance, for keeping a ferry over Detroit river, between the city and Windsor on the opposite side of the river, in Canada, without a license from the city for that purpose, and was fined one dollar and the costs.

Several objections are taken to the proceedings before the Recorder.

The first objection relates to the form of the complaint; but as that has been waived we shall pass over it without further noticing it, and proceed to the consideration of the several objections going to the merits of the case.

The first of these objections is a want of power in the Common Council of the city to pass the ordinance in question.

By the charter power is given the Common Council to license, continue and regulate so many ferries from within said city to the opposite shore of the Detroit river as shall seem most conducive to the public good:— *Laws of* 1857, *p.* 95, § 21, *6th.*

The first section of the city ordinance provides that no person shall keep a ferry or boat for carrying and transporting persons and property across the Detroit river to the opposite shore without a license therefor from the Mayor.

By the second section, the Mayor is authorized to grant a license to any person or company, to keep a ferry or boat to carry and transport persons and property across the river to the opposite shore, on his or their paying into the city Treasury the sum of fifty dollars for each boat which carries and transports passengers, teams and animals, and the sum of twenty-five dollars for each boat which carries and transports passengers only, &c.

And by the eleventh section, any violation of or failure to comply with any of the provisions of the ordinance, is to be punished by a fine not exceeding $200.

It is argued that the power granted does not authorize the prohibition. That is, if we understand the proposition advanced by counsel, that the power given by the charter does not authorize the Common Council to pass a by-law that no person shall keep a ferry without a license. That the Common Council may license a ferry, but that they cannot prevent any one keeping a ferry without a license.

The object of a license is to confer a right that does not exist without a license. And consequently a power to license involves, in the exercise of it, a power to prohibit under a pain or penalty without a license. Otherwise a license would be an idle ceremony—giving no right, conferring no privilege, and exempting from no pain or penalty. If the right existed previous to the law requiring the license, it would not exist afterwards without such license. The fact that a license is required to do an act, is of itself a prohibition of such act without a license. In prohibiting the keeping of a ferry without a license, the ordinance only follows what has been the statute law on that subject from 1827 to the present time, and how much longer we know not: — *Laws of* 1827, *p.* 463; *Laws of* 1833, *p.* 522; *R. S. of* 1838, *p.* 132; *R. S. of* 1846 *p.* 141; *Comp. L. p.* 375.

The next objection is want of power in the city to charge a license fee of $50, or any other sum for the license. It is said the power to license does not carry with it a power to charge for the privilege conferred by the license. That a sum sufficient to cover the cost of making out the license may be charged, but nothing more.

The charter is not silent on this point. By it the Common Council are authorized to " direct the manner of issuing and registering the same (the license), and to prescribe the sum of money to be paid therefor into the

treasury of the corporation:"—*Laws of* 1857, *p.* 107, 63*d.* These last words—to prescribe the sum of money to be paid therefor into the treasury of the corporation—we think show a clear intent to make licenses a source of revenue to the city. And we see nothing unreasonable in the amount charged as a license fee.

But it is said the license fee is a tax. It is not a tax, within the meaning of that term as used in the State Constitution (*Art.* 14, § 11), and city charter (*Laws* 1857, *p.* 107, 64*th*). It is a price paid for a franchise or public right vested in an individual. Bouvier in speaking of franchises says: "The most common are the grant of a right or privilege of making roads, bridges, establishing ferries, and taking toll for the use of the same:"— 2 *Bouv. Inst. p.* 214.

The only remaining objection, and the one most relied on for a reversal of the judgment, is, that the license fee is a regulation of commerce within the Constitution of the United States, which gives Congress power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes:— *Art.* 8, § 3.

In *Gibbons v. Ogden,* the power of Congress under this clause of the Constitution was stated in the broadest terms. Not that it was necessary to the decision of that case, but in the argument of the Court in support of its decision. And yet it was conceded by the Court in that case that it did not extend to inspection laws, quarantine laws, turnpikes, ferries, &c.:— 9 *Wheat.* 203. And in *The City of New York v. Miln,* 11 *Pet.* 133, the concession made in that case was referred to with approbation by the same Court. The question was whether a statute of the State of New York requiring under a certain penalty the master of every vessel arriving from a foreign port, within twenty-four hours after his arrival, to make a report in writing, containing the names, ages, and last legal settlement of every person on board, was a regulation of

commerce within the Federal Constitution. It. was held to. be a police regulation of the State only, and not within the power delegated to Congress. And in *The People v. Babcock*, 11 *Wend.* 586, it was held that the Common Pleas of Niagara county had power to grant licenses to keep ferries on the Niagara River, although the jurisdiction of the State extended only to the center of the river; and that to maintain a ferry upon that river for transporting across the stream persons or goods for hire or profit, unless author-. ized in the manner prescribed by law, would subject the offender to punishment as for a misdemeanor.

The object of the constitutional grant is too obvious to be mistaken. It was not intended for the regulation of commerce within a State. This is universally conceded; and the power could not have been given without danger of absorbing the legislative power of the States.

Roads, and bridges when a part of a public highway, and turnpikes within a State, are clearly subjects of local legislation. It is difficult to conceive of any more so. And. what is a ferry? It is a public highway or thoroughfare across a stream of water or river by boat instead of by a bridge. Now suppose no river separating the city of Detroit from Canada, and a turnpike running into the city from the boundary line between the two; and suppose further, that all commerce between the United States and a foreign country, where there is no stream of water or river separating the two, by an act of Congress was required to, be by a certain description of wagons licensed for the purpose; would any one suppose the owners of such wagons would have a right to enter the city from Canada by the turnpike without paying toll? Suppose the dividing line between Canada and the State to be the Canada shore of the Detroit river, and the turnpike to cross the river by a bridge, could the bridge be crossed without paying toll? Now the ferry boat is as much a part of the ferry as the. bridge is a part of the turnpike. The one is stationary, while.

the other moves to and fro, it may be said. Is not the draw of a bridge, that is moved to and fro as a vessel or a team may want to pass, as much a part of the bridge as the timbers that remain stationary? It is the same with the ferry boat. It is as much a part of the ferry as the landings on the shore. And as there can not be a whole without all its parts, there can not be a ferry without a boat.

The fallacy of the doctrine contended for consists in supposing that the license of a vessel for the coasting and foreign trade confers on it the franchise of a ferry.

Ferries are as clearly creatures of local legislation as roads and bridges. And the establishment and regulation of them are as necessary for the convenience of the traveling and business public.

It is only that part of the ferry lying within the State the ordinance can control, except as a condition of the license the point of landing may be fixed on the opposite shore. It in no way interferes with vessels passing from one side of the river to the other, engaged in commerce under the laws of Congress.

The judgment of the Recorder's Court must be affirmed.

Since drawing up this opinion we have seen the case of *Conway v. Taylor*, 1 *Black*, 603, decided by the Supreme Court of the United States at its last term, in which it is held that the authority to establish and regulate ferries is not included in the power of the Federal Government to regulate commerce under the Constitution of the United States.

CHRISTIANCY and CAMPBELL JJ. concurred.

MARTIN CH. J.:

The Gem is a boat duly enrolled and licensed under the laws of the United States, for the coasting and foreign trade. That the regulation of such trade is exclusively

within the jurisdiction of the United States will not be questioned. The power having been exercised in the case of the Gem, the license conveyed the right of engaging in commerce to her as fully as to every other vessel or boat employed in foreign trade; and as the power to regulate commerce with foreign nations is exclusively in Congress, and has been exercised, no concurrent power exists in the State respecting it. These propositions are not questioned, but their application is denied in this case, because it is said the Gem is a ferry boat, and that ferries are not within the jurisdiction of Congress. Now what is a ferry? It is a species of franchise, being a liberty or privilege arising from grant or prescription, to have a boat or boats for carrying men and horses across a river for reasonable *fare* or toll (*Burrill*). If the river be a boundary between this and a foreign nation, I can not see why the ferriage is not foreign commerce, and exclusively within the jurisdiction of the United States. Commerce, says Mr. Justice Grier in the passenger cases (7 *Howard*), means something more than traffic — *it is intercourse ;* and the power committed to Congress to regulate commerce is exercised by prescribing rules for carrying on that intercourse; and Mr. Justice McLean says it includes navigation and intercourse, and that the transportation of men is a part of commerce is not now an open question. In *Gibbons v. Ogden*, it is said that no clear distinction is perceived, between the power to regulate vessels in transporting men for hire and property for hire; and that a power to regulate navigation is as expressly granted as if that term had been added to the word commerce. If therefore the United States had authority to grant a license to the Gem, and under and by virtue of the laws of the United States such license has been granted, I do not clearly see how any license from the city of Detroit to do the same thing can be otherwise than wholly nugatory and inoperative. A license either conveys the right to do a thing or it conveys no-

right; and if it conveys a right it conveys the whole right.

But it is contended by the attorneys for the People, that while they concede that the right to regulate com_ merce includes the right to regulate navigation, and that the transportation of passengers falls within this power, yet the conveyance of passengers from a foreign country to the United States, in the ordinary operations of com- merce, or their transportation from one State to another in the operations of a proper coasting trade, is a very dif- ferent matter from the running of a ferry for carrying them. I can not perceive the distinction. The delivery of a cargo at a foreign port makes a foreign voyage; and Windsor and Detroit are, as respects each other, as much foreign ports as Boston and Liverpool. The length of the voyage has nothing to do with this question; and the Gem has, under her license and enrolment, as just right to perform voyages from Detroit to Windsor as to Chatham or Quebec, and with the same privileges and immunities.

But it is said that the city of Detroit may license ferries at least as far as the center of the river, for her jurisdiction extends thus far; and that the ferry is in respect to the landing and not to the water; and that although a license to establish a ferry which does not extend across the river may be less valuable for that reason, it is not the less valid as far as it goes. To the first part of this proposition it is a sufficient reply, that the city of Detroit does not assume to grant licenses to ferry passengers to the middle of the stream, but to the Canada shore; and prohibits under a penalty the keeping a ferry or boat for the purpose of transporting *persons and property across* the Detroit river *to the opposite shore* without a license. If this be not a restraint upon foreign commerce, and an infringement upon the jurisdiction of the United States, I confess my inability to determine what

is. And although there is good authority for saying that the ferry is in respect to the landing and not to the water, and the landing may belong to one and the water to another, and that though the license to establish a ferry which does not extend across the river may be less valuable for that reason, it is not the less valid as far as it goes (see *People v. Babcock*, 11 *Wend.* 586; *Conway v. Taylor*, 1 *Black*, 603); still I am at a loss to understand the reasoning which confines it to our shores, or that which applies it to a case of foreign intercourse and navigation. I can not conceive of a ferry without landings upon both banks of the river; and it is to my mind an absurdity to talk of a ferry which carries passengers to the middle of a stream and leaves them there, or returns them to the landing from which they were taken. A ferry is an entirety, and can not be divided by the thread of a stream. It must extend across or be no ferry. It is held in *Peter v. Kendal*, 6 *B. & C.* 703, that the owner of a ferry must, *as an incident to the ferry*, have such right to use the land *on both sides* as to enable him to embark and disembark passengers, but he need not for that purpose have any property in the soil, it being sufficient if he has a right to use the land for all the purposes of his ferry. How far this rule is applicable to ferries upon our interior rivers, forming the boundary line of States, it is unnecessary to inquire; but it establishes the principle for which I contend, viz: that there can be no ferry which does not extend from bank to bank. I hold, therefore, that if the ordinance controls any part it controls the entire ferry, from bank to bank; for it prohibits landing and departure, and what is a ferry without these? It therefore controls and assumes to regulate commerce with a foreign nation, and is unconstitutional.

But it is contended that the city may grant these licenses as police regulations. I can not coincide in this view. To me the transaction seems to be only the sale

of a franchise ; a source of revenue from interference with commerce. It has no connection with the good order and security of the city or the citizen (however it may be in the case of judicious regulations independent of the franchise)—but is entirely outside; and the police power of the city can not draw within its jurisdiction objects which lie beyond it, under this or any other pretence. It might, for any reason that I can see, assume as well to grant licenses to boats running to Malden or to Goderich as to those running to Windsor; for it is not the cargo, but the voyage, which determines the character of the commerce; and I can not well see how a voyage directly across a stream of water, if destined to a foreign port, is any more subject to the jurisdiction of the city than one up or down the stream.

I refer, in further illustration of my views, to *Sinnot v. Davenport*, 22 *How.* 227; *Foster v. Davenport, Ibid.* 244; *Prigg v. Pennsylvania*, 16 *Pet.* 617; *Fitch v. Livingston*, 4 *Sandf.* 492.

I think the judgment should be reversed.

*Judgment affirmed.*