WIGGINS FERRY COMPANY

*v.*

CITY OF EAST ST. LOUIS.

*Filed at Mt. Vernon March 29, 1882—Rehearing denied May Term, 1882.*

1. LICENSE—*power of the legislature—license fee as distinguished from a tax—application of the rule of uniformity.* The constitution of 1870 has in nowise limited the power of the legislature to impose, or to authorize the imposition of, the duty upon natural persons or corporations to procure a license to pursue any calling. In this respect the power of the legislature is the same as it has ever been since the organization of the State government, to require persons engaged in various avocations to procure a license for the purpose, and thus to regulate the exercise of the vocation.

2. A license fee, when applied to any proper subject, is not a "tax," in the sense of that clause of the constitution prescribing the rule of uniformity in levying taxes.

3. FERRY LICENSE—*the rule applied thereto.* So, it is competent for the legislature to authorize a municipal corporation to demand a license fee from the keeper of a ferry, for the privilege of carrying on the business of ferrying within its jurisdiction.

4. SAME—*as applied to the Wiggins Ferry Company in the exercise of its franchise upon the Mississippi river.* The city of East St. Louis, under a general authorization in its charter "to license, tax and regulate ferries," imposed a license fee, by ordinance, upon the keepers of ferries, for each boat ferrying between that city and the opposite bank of the Mississippi river. The Wiggins Ferry Company, which was organized for the purpose of running a ferry between the city of East St. Louis and the opposite bank of the Mississippi river, resisted the collection of this license fee. The original grant of the ferry privilege was to Samuel Wiggins, in 1819, it being provided in the grant that the ferry thereby established should be subject to the same taxes as should be imposed on other ferries in the State, and "under the same regulations and forfeitures." In 1853 the present corporation—the Wiggins Ferry Company—was organized under an act of the General Assembly, which provided that the new company might purchase, hold, use and enjoy the ferry franchise theretofore granted to Samuel Wiggins. In questioning the power to impose the license fee by the city, the ferry company contended that as it was using the franchise as originally granted to Wiggins, no higher taxes could be imposed upon it than any other ferry in the State was liable to pay, therefore the city could not properly demand this special license fee. But it was *held*, keeping in view the distinction between a license fee and a tax, the constitutional rule of uniformity in the levy of taxes had

no application, and nothing contained in either the original grant of the ferry franchise, or in the charter of 1853, could be construed as an exemption from the exercise of the power to impose the license fee.

5. Moreover, this ferry company had for years paid a license fee to the county in which it was exercising its franchise, under the general law on that subject, thereby, by its own construction of its charter, conceding the power to require the fee, and the company should be held to that construction, as authorizing the legislature to so understand it, in granting the power to the city.

6. Besides, in these relations, corporations stand upon precisely the same footing with natural persons, and the legislature may not grant to either special exemptions from the ordinary and usual burdens of government.

7. SAME—*the Mississippi river being a navigable stream, as to the relative powers of the State and Federal governments in relation thereto.* As affecting the power of the State to authorize a municipal corporation to impose this license fee in respect to a ferry upon the Mississippi river, it was said that river is a navigable stream, and therefore is under the control of the Congress; that Congress has the power to regulate inter-State commerce, and has regulated it by requiring every ferry boat propelled by steam to be inspected, according to an act of Congress, and such regulations as Congress may prescribe must be complied with before a certificate will be granted. But it was *held*, these inspection laws were in no sense to be regarded as a regulation of commerce, but were purely a police regulation for the safety of persons. The exercise of such a police power by the Federal government in no way impaired the authority of the State to exercise *its* police power in the granting of ferry licenses. This power in the State is one of the reserved powers, never delegated to the general government.

8. Nor is the license fee a tonnage tax, or its imposition an attempt to regulate commerce by the State. A tonnage tax does not apply to ferry boats, but to a wholly different class of vessels. The imposition of a license fee is a police regulation, and not a regulation of commerce, in any such sense as that in which the term is used in relation to the power of Congress to regulate commerce between the States.

APPEAL from the City Court of East St. Louis; the Hon. CHARLES T. WARE, Judge, presiding.

Mr. H. P. BUXTON, for the appellant:

The power of appellee to make this exaction is claimed under the grant in its charter "to regulate, tax and license ferry boats." Private Laws of 1869, vol. 1, p. 893.

1. It can not be maintained under the power to "tax." The power to tax toll bridges, ferries, etc., as such, must be

exercised, if at all, by general law, uniform as to the class upon which it operates.    Const. 1870, art. 9, sec. 1; *Transportation Co.* v. *Wheeling*, 99 U. S. 273; *Walker* v. *Springfield*, 94 Ill. 374.

The fourth section of the act of 1819, recited in the preamble to appellant's charter, provides that the ferry shall be subject to the same taxes as then were or thereafter might be imposed on other ferries, and subject to the same regulations and forfeitures.    This limits the power to tax this ferry different from other ferries.

2.    It can not be maintained under the power to "regulate."    It is no regulation to simply demand the payment of money.    *New York* v. *Railroad Co.* 34 Barb. 41; *Mayor* v. *Railroad Co.* 32 N. Y. 261.

3.    It can not be maintained under the power to "license." Appellant needs no license to do an act, the power to do which has already been perpetually granted by its charter.

4.    This ferry, being over a navigable river, is under the control of Congress, whenever it legislates on the subject. That the power to regulate includes the regulation of navigation, see *Cooley* v. *Board of Wardens*, 12 How. 315; *Railroad Co.* v. *Husen*, 95 U. S. 469.

Congress for the first time legislated on this subject in 1871. Rev. Stat. of United States, p. 863, secs. 4426, 4399, 4400.

5.    It is a tonnage tax, and as such violates the Federal constitution.    See *Steamship* v. *Port Wardens*, 6 Wall. 31; *Transportation Co.* v. *Wheeling*, 99 U. S. 283; *Sinnot* v. *Mobile*, 22 How. 227; *Henderson* v. *New York*, 92 U. S. 259.

Mr. J. M. FREELS, and Mr. B. H. CANBY, for the appellee:

The constitution of 1870 is substantially the same as that of 1848, in regard to taxing ferries, etc.    Under neither is the power to license prohibited.    A license fee is not a tax. *Walker* v. *Springfield*, 94 Ill. 373; *People* v. *Thurber*, 13 id. 554; *City of East St. Louis* v. *Wehrung*, 46 id. 393.

Alienation of the taxing power must be explicit. It is never presumed. Burr on Taxation, sec. 68; *Mobile* v. *Stein*, 54 Ala. 23; *Probasco* v. *Moundsville*, 11 W. Va. 501; *Hart* v. *Plum*, 14 Cal. 148.

The power to tax, license and regulate, authorizes a city to adopt any reasonable ordinance for the purpose, either to tax, to license, or regulate. *Wiggins* v. *City of Chicago*, 68 Ill. 377; *Chicago Packing Co.* v. *Chicago*, 88 id. 221; 1 Dillon on Mun. Corp. sec. 79.

If appellant were required by the general law to take out a county license, which it is not, it would not exempt it from taking out the city license required. *Ex parte Siebenhauer*, 14 Neb. 372; *Ex parte Robinson*, 12 Nev. 269; *Ex parte Cohn*, 13 id. 426.

Ferries are the creatures of local legislation, and are subject to the laws of taxation and the police powers and regulations of the States by which they are created, and do not fall within the constitutional provision giving Congress the power to regulate commerce, etc. *Gibbons* v. *Ogden*, 9 Wheat. 1; *Conway et al.* v. *Taylor's Exr.* 1 Blackf. 603; *Fanning* v. *Gregoire*, 9 How. 534; *Osborne* v. *Mobile*, 16 Wall. 479.

Whatever exists within the limits of a State in the form of property, with some exceptions, is subject to its laws. These are subjects of State regulations and State taxation, and there is no Federal power under the constitution which can impair this exercise of State sovereignty. *Nathan* v. *Louisiana*, 8 How. 80; *Woodruff* v. *Parkham*, 8 Wall. 123; *Hinson* v. *Tott*, 8 id. 148; *State* v. *Bell*, Phill. (N. C.) L. 84.

Mr. M. MILLARD, also for the appellee:

It is claimed that appellant's charter is a perpetual license, and contains an express exemption from this form of taxation. A sufficient answer is, that the legislature had no power to exempt the company from any kind of tax. *Jack-*

*sonville* v. *McConnell*, 12 Ill. 138; *O'Kane* v. *Triel et al.* 25 id. 557; *Hunsacker et ·al.* v. *Wright et al.* 30 id. 146; *People* v. *Barger*, 62 id. 452.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The General Assembly, on the 11th day of February, 1853, adopted an act incorporating the Wiggins Ferry Company, at East St. Louis. The charter conferred various powers, and declared the corporation perpetual. The act authorized the company to exercise all of the powers previously conferred on Samuel Wiggins, with others. A number of persons were named as incorporators, the charter was adopted, and the grant accepted, and the company organized and has ever since exercised its franchises by maintaining and operating ferry boats, as authorized by the charter.

The 54th ·section of article 3 of the charter of East St. Louis, approved the 16th of February, 1865, (vol. 1, Special Laws, p. 350,) gives the city power "to license, tax and regulate ferries," and under this provision the city, on the 1st of June, 1868, adopted an ordinance, as follows:

"Section 16. Keepers of ferries shall pay $50 license for each boat ferrying between this city and the opposite bank of the river, for one year, or $25 for each boat for six months."

The company procured a license, and paid therefor from that time until the 1st of May, 1875, after which date it failed to procure a license, but continued to operate its ferry boats as before. On the 6th of August, 1874, the city passed an ordinance fixing ferry licenses at $150 per annum on each boat. In November, 1877, it passed an ordinance providing that the city should not, for any purpose, require a license of or collect any fee for any business, and repealed all ordinances requiring licenses.

On the 7th day of October, 1878, the city adopted an ordinance similar to the ordinance of the 1st of June, 1868, except it fixed the license fee at $100 for each boat, per

annum.   The company employed eight boats in ferrying persons and property, under their charter, from the 1st of May, 1875, until this suit was brought, without procuring any license from the city for the purpose.   It was stipulated that the company paid the county of St. Clair for a license $300 per annum.   It was agreed that the acts of the legislature, and laws, rules and regulations of the United States, and of inspections, the charter and ordinances of the city, or copies thereof, might be used and referred to as part of the record, without proof or authentication; that on the facts and laws the court should determine the right of the city to demand, and the liability of the company to pay, the license fees fixed by the ordinances, and render judgment accordingly, without reference to the pleadings.   The court found, and rendered a judgment, in favor of the city for $1600. The record is brought to this court, and various errors are assigned for a reversal.

It is urged that the recovery can not be maintained under the power to tax, under the power to regulate, or under the power to license, because this ferry is over a navigable river, and beyond State control,—that it is in violation of the constitutional rule of uniformity of taxation, and that it is a tonnage tax, and contrary to the Federal constitution.   We shall consider these objections, and give our views as concisely as the nature of the questions will permit, for a clear understanding of the case.

It is not denied that the ordinance was properly passed, was in full force, and the amount of the recovery is correct, if the city had the power to pass the ordinance.   But the power is denied.   It is claimed that the constitution of 1870 prohibits the exercise of such power.   The first section of article 9 of that instrument provides for an *ad valorum* tax on all property.   It also provides that "the General Assembly shall have power to tax peddlers, auctioneers, brokers, hawkers, merchants, commission merchants, showmen, jugglers,

inn-keepers, grocery-keepers, liquor dealers, toll bridges, fer-
ries, insurance, telegraph and express interests or business,
*   *   *   in such manner as it shall, from time to time,
direct, by general law, uniform as to the class upon which it
operates."

In the cases of *The People* v. *Thurber*, 13 Ill. 554, *Illinois
Mutual Fire Ins. Co.* v. *City of Peoria*, 29 id. 180, *Ducat* v.
*Chicago*, 48 id. 172, and *Walker* v. *City of Springfield*, 94 id.
364, it was held that a per cent on receipts of premiums on
insurance policies, required to be paid by insurance agents
of foreign companies, was not a tax, but a sum paid for a
license to transact the business.

In the case of *East St. Louis* v. *Wehrung*, 46 Ill. 392, it
was held that a license to sell liquor is not a tax, nor is it
governed by the rule of uniformity required in levying taxes,
and that the General Assembly might delegate the power to
municipal corporations; and that when so delegated, the
power must be exercised by general rule in the city, and it
had no power to discriminate between different persons in
the amount charged. And the same principle was announced
in *East St. Louis* v. *Wehrung*, unreported, January term, 1868.
It was there said, the rule for granting licenses must be
uniform in the municipality, and an ordinance to empower
the city treasurer to fix the license fee was therefore void.

The court also held there was a difference between a tax
and a license fee, in *Chicago Packing Co.* v. *Chicago*, 88 Ill.
221, and that the constitutional provision in reference to
taxation has no application to fees exacted for a license, and
in this distinction this court is sustained by the decisions of
other courts. See *Ex parte Robinson*, 12 Nev. 263; *Ex parte
Cohn*, 13 id. 424; *Ex parte Siebenhauer*, 14 id. 372; *Bohler*
v. *Schneider*, 49 Ga. 195; *Home Ins. Co.* v. *Augusta*, 50 id.
530; *City of Sacramento* v. *Crocker*, 16 Cal. 120; *Henry* v.
*The State*, 26 Ark. 521; *Straub* v. *Gordon*, 27 id. 625. This
distinction is fully established by authority.

The latter words in the first section, requiring the tax to be by general law, and uniform as to the class upon which it operates, have no operation upon this case, because this, as shown by the cases cited, is not a tax, but a license. The constitution has not prohibited the General Assembly from imposing or authorizing the imposition of the duty to procure a license to pursue any calling, nor has it limited the power or limited its exercise. In this respect the power of the legislature is the same as it has ever been since the organization of the State government, and no one, we presume, will question the legislative power to require persons engaged in various avocations to procure a license for the purpose, and thus regulate the exercise of an avocation. It is a power exercised by all governments, and is one of the essential means of providing for raising revenue for both the State and local governments, and the regulation of business. If the constitutional convention had intended to make so radical a change as to deprive the legislature of this power, or to make a license fee uniform throughout the State on all persons exercising the same calling, without regard to the capital invested, business done or profits realized, that body would have employed very different language from that which we find in that instrument. They were aware that this court had held that a license fee was not a tax, in the constitutional sense, and we have a right to suppose they used the term "tax," in a sense to exclude a license. That body could not have intended to deprive municipal bodies of this great source of revenue, and to abandon the power, either directly or through municipal bodies, to regulate various callings. If they had intended to prevent all licenses for all purposes, they would have said it, or if it was intended to restrain the exercise of the power to regulate them, it would have been so provided.

It is insisted that the fourth section of the act authorizing Wiggins to establish a ferry (Sess. Laws 1819, p. 105,) pro-

vides that the ferry so established should be subject to the same taxes as should be imposed on other ferries in the State, and "under the same regulations and forfeitures." It is therefore contended, that when the legislature, in 1853, created the present corporation, it, by the first section of the charter, provided the corporation might purchase, hold, use and enjoy the ferry franchise theretofore granted to Samuel Wiggins, and inasmuch as the company is using that franchise, it is entitled to use the same without paying higher taxes than any other ferry in the State. We have seen this license fee is not a tax. In construing all grants by the government, the rule is, that it must be strict against the grantee, and the term "tax," can not be held to be a license fee. The legislature did not agree to exempt the corporation from taxes and other burthens. By general law all other ferries were required to pay a license fee to the county, of not less than $2 nor more than $100, as should be fixed by the county commissioners. (Sec. 14 of the chapter entitled "Ferries," Rev. Stat. 1845.) This was afterwards increased, by enactment, to not less than $5 and not more than $300, and it is stipulated that this company for years paid annually to St. Clair county the latter sum, thus showing that, by its own construction of its charter, the power to require this fee was conceded, and the ferry company should now be held to that construction. It therefore follows that the legislature had the right to act on that construction, and to authorize the city to impose the fee, instead of the county. It may be, that by authorizing the city to exercise the power, it operated to deprive the county of the right; but that in nowise affects this question.

The legislature has power to create an artificial person called a corporation, and to endow it with rights and powers resembling those of natural persons, but it has no power to endow such bodies with powers or rights higher or greater than those possessed by natural persons, nor can that body

exempt such artificial persons from governmental control, regulation or obedience to the laws of the State, or the governmental burthens imposed on natural persons. When created they became *quasi* inhabitants of the State, and entitled to precisely the same protection in their rights as natural persons, and they, on every principle of reason and justice, must be subjected to the same governmental control and regulation, and to all of the burthens for the support of government to which natural persons are subjected. They, to the extent of their privileges, become persons and a portion of the governed, and liable to be governed as are the individuals of the community in which they are located and transact their corporate business. A corporation being the creature of the legislature, has only such rights or franchises as are conferred upon it by its creator, and is capable of exercising none other. A natural person is born with all the rights his intellectual and physical powers are capable of performing. In a state of nature his lack of these capacities are the only limitations on his rights. He, therefore, is endowed by nature with all the rights a corporation possesses, and vastly more. The rights with which nature has endowed him are incontestably as sacred, but no more so, than those conferred on a private corporation.

Government is formed by depriving all persons of a portion of their natural rights. The rights they enjoy under government are not conferred by it, but are only those of which they have not been deprived. It is only by a deprivation of all persons of a portion of their rights, that it is possible to form and maintain government. Without it there could be none but government by each individual, as he might be able to sustain his power. Its organization means a surrender of a portion and the control of his reserved rights, and the power of the government to control all persons in the exercise of these reserved rights must be conceded. *Salus populi suprema lex*, is a maxim of the law that has peculiar force.

In the maintenance of the government and the general welfare, individual rights, whether of natural persons or corporate bodies, must yield to the public good, and the General Assembly is invested with the sole power of determining under what restraints all persons, whether natural or artificial, shall pursue their various avocations, unless restricted by constitutional limitation. That is an essential attribute of government. The regulation of ferries is referable to the police power, which can not be granted away even to corporations. *Beer Co.* v. *Massachusetts*, 97 U. S. 25, *Patterson* v. *Kentucky*, id. 501, *Stone* v. *Mississippi*, 101 U. S. 820, and other cases.

Any man owning or having control of land on opposite banks of a river, has the natural right to procure boats and establish and maintain a ferry, and charge tolls for the services rendered persons in crossing them from one side to the other.; but the General Assembly, in the exercise of its police power, which pervades every department of business, and its regulation and control, as well as the acts of persons, has deprived all persons of that right unless they shall conform to prescribed requirements, and pay the public a prescribed fee for a license to operate the ferry and charge tolls. Now, when an artificial person is empowered to operate a ferry, its right to do so is no greater or more sacred than that of a natural person. They are placed on an equality as to rights and power of control. If the legislature may control or regulate the power of an individual in the exercise of his natural right to establish a ferry, why may it not exercise the same control over the artificial person it has created? Is there a possible reason, founded on justice, why the legislature may not exercise the same power over a creature it has brought into existence, that it may over a person who has been endowed with rights by the great Ruler of the universe? The legislature, even if it has the power to do so, did not, in terms, exempt this corporation, by its charter, from the same power of control that it may exercise over a natural

person, and we will not strain construction and violate the
rule that in a grant by the government all doubts must be
solved in its favor, and nothing passes except it clearly
appears to have been so intended. This rule is as old as the
law itself. The charter gave this corporate body the right to
establish and maintain a ferry, and that right was no greater
than the same right possessed by an individual, and it has
never been denied that the legislature might impose a license
fee to authorize a natural person to establish and maintain a
ferry. The legislature only conferred the same power on the
corporate body as that possessed by natural persons, and it
undoubtedly has the same right to limit and control its exer-
cise of the right that it may the right of a natural person.
It would be unreasonable, unjust, and contrary to the great
principle of equality of privileges and burthens, upon which
our government is based, to make corporate bodies a privi-
leged class, and exempt them from the common governmental
burthens. They, like natural persons, should contribute to
the support of the government that affords protection to all
of their rights.

Natural persons were born with the right to peddle,
auction, follow the business of brokers, hawking, merchants,
commission men, showmen, jugglers, inn-keepers, grocery-
keepers, liquor dealers, to establish toll bridges, ferries, etc.,
and most, if not all, of these occupations have been pursued
in all ages, in all countries, and in all conditions of men,
from the savage to the most civilized. Yet all civilized gov-
ernments have controlled them, and required persons, for the
public good, to pay for and procure a license to follow these
various avocations. The power has been exercised in this
State from its very organization almost, without question.
If this power may be successfully challenged, it would seem
to be doubtful what power might not be, with equal reason.
The legislature may exercise all power not prohibited, and
unquestionably all legislative power not limited by the funda-

mental law.  This power was not prohibited, and it was therefore well exercised.

It is said that this is a navigable river, and therefore is under the control of Congress.  And it is further said Congress has the power to regulate inter-State commerce, and has regulated it by requiring every ferry boat propelled by steam to be inspected, according to an act of Congress, and such other regulations as Congress may prescribe shall be complied with before a certificate shall be granted.  Nothing, it appears to us, can be plainer than this was intended purely as a police regulation for the safety of persons, and not a measure, in the slightest degree, to regulate commerce.  The language can not be tortured into such a purpose.  The very language of the section states it is for the better security of life that the regulations shall be complied with before the certificate of the inspector shall be granted.  To hold that the section was intended to regulate commerce, would violate every known rule of construction, and this would seem to be obvious to all persons.

It is also urged that it violates the rule of uniformity. The ordinance applies to all ferries and ferry boats in the city alike, and makes no discrimination.  And this answers the rule laid down in *City of East St. Louis* v. *Wehrung, supra.*  There is no force in this position.

It is again said it is a tonnage tax, and a regulation of commerce.  How this can be said to be a tonnage tax on a ferry boat, or a regulation of commerce, is to us incomprehensible. That tax applies to a wholly different class of vessels, as is shown by the following decisions.  In *Gibbons* v. *Ogden,* 9 Wheat. 1, Chief Justice MARSHALL said:  "But the inspection laws are said to be regulations of commerce, and are certainly recognized in the constitution as being passed in the exercise of a power remaining with the States.  That inspection laws may have a remote and considerable influ-

ence on commerce, will not be denied; but that a power to regulate commerce is the source from which the right to pass them is derived, can not be admitted.   The object of inspection laws is to improve the quality of articles produced by the labor of a country, to fit them for exportation, or, it may be, for domestic use.   They act upon the subject before it becomes an article of foreign commerce, or of commerce among the States, and prepare it for that purpose.   They form a portion of that immense mass of legislation which embraces everything within the territory of a State not surrendered to the general government,—all which can be most advantageously exercised by the States themselves.   Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, *ferries, etc.,* are component parts of this mass."   He again says, in the same case:   "No direct power over these objects is granted to Congress, and consequently they remain subject to State legislation.   If the legislative power of the Union can reach them, it must be for national purposes,—it must be where power is expressly given for a special purpose, or is clearly incidental to some power which is expressly given."

The case of *Conway* v. *Taylor*, 1 Black, 603, recognizes the same doctrine, and the court says:   "Lastly, it is urged that the 'Commodore' having been enrolled under the laws of the United States, and licensed under those laws for the coasting trade, the decree violates the rights which the enrollment and license gave to the appellants in respect of that trade, by obstructing the free navigation of the Ohio.   *   *   *   The language of the constitution, to which this objection refers, is as follows:   'The Congress shall have power to regulate commerce with foreign nations and among the several States, and with the Indian tribes.'   (Art. 1, sec. 8, clause 4.)   The character and extent of the power thus conferred, and the boundaries which separate that power from

the powers of the States, touching the same subject, came under discussion in this court for the first time in *Gibbons* v. *Ogden*, 9 Wheat. 1." The court then quotes what was said by Chief Justice MARSHALL, above cited, and then proceeds: "'The same principle has been repeatedly affirmed in other cases, both in this and the State courts. In *Fanning* v. *Gregoire*, 9 How. 534, before referred to, this court held, the argument that the free navigation of the Mississippi, guaranteed by the ordinance of 1787, or any right which may be supposed to arise from the exercise of the commercial power of Congress, does not apply in this case. Neither of these interferes with the *police power* of a State in granting *ferry licenses*. The counsel for the appellees has invoked the authority of *Cooley* v. *Board of Wardens of Philadelphia*, 12 How. 299, in which a majority of this court held that upon certain subjects affecting commerce, as placed under the guardianship of the constitution of the United States, the States may pass laws which will be operative till Congress shall see fit to annul them. In the view we have taken of this case we have found it unnecessary to consider that subject. * * * That the authority lies within the scope of that immense mass of undelegated powers which are reserved to the States respectively, we think too clear to admit of doubt." To the same effect are *Nathan* v. *Louisiana*, 8 How. 73, *Woodward* v. *Parkham*, 8 Wall. 123, *Hinson* v. *Lott*, id. 148, and *Chilvers* v. *The People*, 11 Mich. 43. These authorities most clearly settle this proposition. Nor is the government inspector's certificate a license that abrogates or supersedes the legislative and municipal requirements. That is but a protection against penalties imposed by the government, still leaving the party liable to penalties for a failure to comply with the State and municipal requirements. It is the State laws which confer the power to pursue the business. *Block* v. *Jacksonville*, 36 Ill. 301. That case is decisive of that question.

In any view we have been able to consider the case, we must hold that the legislature had the power to require appellant to procure a license to run its ferry, and having the right, its power is undeniable to delegate its exercise to the municipality, precisely as it did to license, tax and regulate billiard tables, ten-pin alleys and ball alleys; to restrain, regulate and prohibit the sale or giving away intoxicating liquors; to direct, license, and control wagons and other vehicles, and to license the various other avocations as authorized by the charter.

The whole record considered, the judgment of the court below must be affirmed.

*Judgment affirmed.*

Mr. JUSTICE MULKEY: I concur in the conclusion, but not in all that is said in the foregoing opinion.

Mr. JUSTICE SCHOLFIELD: I do not concur in this opinion.

Mr. JUSTICE DICKEY, dissenting:

I can not concur in this decision. The power to impose this burden upon this ferry company is claimed by the city under a clause in its charter, granted in 1869, wherein power is conferred upon the city, in general terms, "to regulate, tax and license ferry boats."

I concur in the view that this ordinance is not an exercise of the power to "tax" ferry boats. The ordinance imposing this burden does not profess to impose a tax. A tax on "ferry boats" is a tax on property, and as such, under the constitution of 1848, as well as that of 1870, can only be imposed by valuation. Nor does this profess to be a tax upon the business of running or keeping a ferry. The decision in this case does not place the validity of the ordinance upon the power to tax. Obviously the passage of this ordinance was not an exercise of the power to regulate ferry boats. There is not a word in the ordinance relating to the mode of

operating the ferry boats in question; nothing relating to the material of which they shall consist, or the mode of their construction; or relating to the character or skill of those actually running these boats; or relating to the care to be exercised in receiving or discharge of passengers or goods, or the manner of landing; or relating to any matter which can properly be classed under the exercise of police powers or the power to regulate. This ordinance is simply an attempt to exercise the power to "license," pure and simple. This power, where there is no attempt to regulate or to tax, can only be exercised in a case where the authority imposing the burden has the rightful power to prohibit the thing done, or, in its discretion, to permit it to be done. This doctrine is taught in *The People* v. *Thurber*, 13 Ill. 544; *Insurance Co.* v. *Peoria*, 29 id. 180; *East St. Louis* v. *Wehrung*, 46 id. 392; *Ducat* v. *Chicago*, 48 id. 172; *Walker* v. *Springfield*, 94 id. 372. In *The People* v. *Thurber*, it is said of such a burden: "This is not a tax upon property, but is a burden * * * for the right of exercising a franchise or privilege which the legislature would have the right to withhold or inhibit altogether." This language is quoted with approbation in *Walker* v. *Springfield*, decided in 1880. The word "tax," as used in the constitution of Michigan, received the same interpretation, and was held not to embrace a license fee. (*Chilvers* v. *The People*, 11 Mich. 43.) It is there declared of a license fee, that "it is not a tax," in the sense of that word in their constitution and statutes, and that "it is a price paid for a franchise * * * vested in the individual."

The mere power to license and exact a license fee *as a source of revenue*, is, and from its very nature should always be, confined to a permission granted to exercise some privilege or franchise, or to do some thing which may not lawfully be done without permission, or which the power exacting the same might lawfully prohibit altogether. Remember, as was said in *People* v. *Thurber*, *supra*, a license fee proper,

exacted merely for the purposes of revenue, "is a burden" imposed as payment "for the right of exercising a franchise or privilege which the legislature would have the right to withhold or inhibit altogether;" and that, as was said in the Michigan case, "it is a price paid for a franchise." The power to license, strictly and properly speaking, is simply a power *to sell a privilege,* and hence is confined to the granting of a privilege to do a thing in a case where the privilege might be withheld, or the doing of the thing might lawfully be prohibited entirely. The ordinance assumes the right of the city in this case to prohibit.

There is a class of cases where the power is granted to require the taking out of licenses before doing certain things, and in which the right to do the thing in question can not lawfully be prohibited altogether. This class of license cases falls properly within the exercise of the power to regulate, where that power is given. Thus, where a municipal corporation has power to regulate the sale of intoxicating liquors, and to license tippling houses, but has not the power to prohibit altogether, it may be required that a license shall be obtained, in order that only discreet persons may be allowed to make such sales, and that bond and security may be required for good behavior in so doing. Hack-drivers in a city may be required, for the better protection of the public, to take out licenses, and wear a number or a badge for identification, and all this under the exercise of police or regulative powers. In this case, as we have already seen, there is no pretense of the exercise of the regulative or police powers,— it is simply the exacting of a license fee, for the purposes of revenue only.

This brings us to the question whether the city of East St. Louis was clothed with power to exact of this ferry company this license fee, for the mere purpose of revenue. Had the city power to prohibit altogether in this case? If it has such power, it is derived from the State of Illinois, contained

37—102 ILL.

in the charter granted in 1869.    Unless the State of Illinois had at that time rightful power to exact such a license fee, it is plain the city can have no such power,—the stream can not rise higher than its source.

In 1819, on March 2d, an act of the legislature was passed granting to Samuel Wiggins, his heirs and assigns, authority to establish and maintain the ferry now owned by this ferry company, and to charge certain rates of ferriage.    The second section of the act forbid the establishment of any other ferry within a mile of this ferry.    The fourth section declared, that "the ferry hereby established shall be subject to. the same *taxes* as are now or hereafter may be imposed upon other ferries within this State, and under the same regulations and penalties; and if the provisions of the second section of this act should be made to appear to the General Assembly to be injurious to the public good, that then, and in such case, the said second section may be repealed."    A sand bar having formed in front of the ferry landing at which Wiggins had established his ferry under the act of 1819, another act was passed on February 6, 1821, reciting the former grant to Wiggins, and granting to him the right to remove his ferry to another landing, "under the same privileges as prescribed in the act of March 2, 1819."    This was done, and the ferry maintained there by Wiggins, his heirs and assigns, until in 1853.    In that year (1853) the Wiggins Ferry Company (the appellant in this case) was chartered, and authorized to purchase the ferry franchise granted to Wiggins, his heirs and assigns, by the acts of 1819 and 1821, and the ferry property thereto pertaining, and to exercise all the powers and enjoy all the privileges which had been so granted to Wiggins and his representatives.    In that charter it was declared, that "nothing in this act shall be construed to create any private right, so as to interfere   *   *   *   with the right of the legislature at any time hereafter to create municipal corporations within the

limits specified, and to confer upon such corporations all such *police powers*   *   *   *   as may be usually and properly conferred upon a city corporation under the constitution of Illinois." (Private Laws of 1853, p. 197.) Under this act the purchase was made, and when the charter of East St. Louis was granted, this ferry company was the owner of the ferry franchise in question. The burden here imposed does not seem to me to be in any sense the exercise of a police power.

The nature and character of that franchise was considered by this court in 1845, in the case of *Mills et al.* v. *County of St. Clair,* 2 Gilm. 197. It was there declared, that "the grant to Wiggins was essentially a contract between him and the State. By its terms, on his part, he is bound to run the ferry, to afford at all times a safe and speedy passage to travelers and their property across the river, to keep for this purpose a supply of boats and hands, and to propel such boats in the manner prescribed by the act; and on its part, *the State contracts* that he *may run the ferry.*   *   *   *   The obligations imposed by the act   *   *   *   must, of necessity, be mutual." In an earlier part of that opinion it is said, in relation to this grant: "When a grant has once been made by legislative authority,   *   *   *   it can not be taken back   *   *   *   until the public interests and welfare shall demand its resumption, and *provision* shall have been made for just compensation to the owner, in the manner required by law."

Thus it is seen, that at the time when the charter of appellee granted power to "*license* ferry boats," this ferry company held, by contract from the State, the right to "run this ferry,"—a right which could not be taken back by the mere fiat of the legislature,—and therefore the legislature had then no power to withhold from this company such right, nor power to inhibit this company from running this ferry, and had not the power, by statute, to exact of this company a price to be paid for the privilege of running the ferry,—a

privilege it already held by grant, and had paid for. Having no such power, the legislature could not grant such a power to the city. The use, then, of the general term, "to license ferry boats," made in the charter, should be held to grant only the power to exact a license fee, for revenue, from persons using ferry boats, who are not already clothed with the right to run without such license. Of course, a corporation has no higher rights than those of an individual under the same conditions. It has, however, *the same* rights. Had Samuel Wiggins continued to own this ferry franchise, could he have been lawfully subjected to this demand? I think not. This corporation stands in his shoes, and has the same rights in this regard.

This ordinance, in so far as it affects appellant, is merely an attempt to exact a license fee, purely for the purposes of revenue, as a price for a privilege which appellant already holds under purchase from Wiggins and others, who held the same by an irrevocable grant from the State, which the State itself could not, by mere legislative act, take away. It is a demand upon this company that it shall purchase from the city a privilege which it already owns by a title beyond the power even of the State to destroy or take away, save upon just compensation, under condemnation proceedings.

The ordinance, in so far as concerns this company, is, I think, incompatible with the statutes of the State granting this franchise to this company, and is therefore, in my judgment, inoperative upon this ferry company.