Minshall, J.
The plaintiffs are persons engaged in the traffic in intoxicating liquors, and brought an action in the court of common pleas of Cuyahoga county, on behalf of themselves and others engaged in the same business, to restrain the treasurer of the county from collectingdhe assessments, etc., made upon the business of each of them as traffickers in intoxicating liquors, under the act of the general assembly passed May 14, 1886, entitled “ an act providing against the evils resulting from the traffic in intoxicating liquors”(83 Ohio L. 157). A temporary injunction having been allowed, an answer was filed and motion made to dissolve the injunction. The motion was sustained on the ground that the petition did not entitle the plaintiffs to the relief asked, and the same was dismissed by the court. On a proceeding in error the judgment was affirmed in the circuit court; and the object of this proceeding is to obtain a reversal of the judgment of the latter as well as of the former court.
All the questions raised and argued arise upon the validity of the act above referred to, known as the Dow law.
No question is made as to the right of the plaintiffs, *556 separately engaged in the traffic in intoxicating liquors, to unite in maintaining this action. Each and all of them have a common and general interest in the question as to the validity of the law, so far as it imposes, or seeks to impose, a tax on the business in which each is engaged. But as to how this can be true when, as to some of the plaintiffs, It is averred that they are exclusively engaged in the traffic in vinous liquors, and have been returned by the assessors as trafficking in spirituous liquors, is not apparent. If it is intended by this averment to claim that such persons are not concluded by the return of the assessor as to their business, a question is made that is not common to the other plaintiffs. If the law be valid, relief in this regard should be sought iu separate actious. It can not be had in this action, for a further reason, that their suit is accompanied with no offer to pay that which would be due from each as a person trafficking in vinous liquors. Nor does it appear from the averments of the petition, or otherwise, which, if any, of the plaintiffs, trafficking exclusively in vinous liquors, have been wrongfully returned by the assessors, as trafficking in spirituous liquors.
The general grounds upon which the invalidity of this law is asserted are : first, that it grants a license to traffic in .intoxicating liquors; second, that it is in substance a tax on property not levied by a uniform rule according to its true value in money; third, that the summary methods which it prescribes for the assessment and collection of the tax are not due process of law; .and fourth, that it is a law of a general nature, not uniform in its operations throughout the state. These grounds, with their respective subsidiary questions, will be considered in the order stated :
I. The competence of the general assembly to provide against the evils resulting from the traffic in intoxicating liquors by a tax levied upon the business, without infringing the provision of the constitution, that no license to traffic therein shall be granted, was recognized in State v. Hipp, 38 Ohio St. 199, was directly affirmed in State v. Frame, 39 Ohio St. 399, and was not denied in the subse *557 quent cases of Butzman v. Whitbeck, 42 Ohio St. 223; King v. Cappellar, 42 Ohio St. 218, and State v. Sinks, 42 Ohio St. 345; and, therefore, the question, in its simple form, as to whether a tax upon the business constitutes a license to traffic in intoxicating liquors, might be regarded as settled by the previous decisions of this court, without further consideration.-
But as it is still insisted in argument that such a tax is in the nature of a license, and can not be imposed without infringing the provisions of the constitution against licensing the traffic, wo do not hesitate to re-examine the grounds upon which the opposite view has been rested; for, if it be clear that a tax upon the traffic in intoxicating liquors is a license, then it would be our duty to declare the law unconstitutional. The objection, however, to the tax upon this ground comes with an ill favor from those engaged in the traffic, as it has the appearance of a reproof of measures desigued as a restraint upon the abuses of the traffic in which they are engaged, unless it be assumed that this provision in the constitution was inserted as a protection to the liquor interests of the state, rather than to promote the temperance and sobriety of its citizens. Such a claim has not, we believe, as yet been made; and, if made, would not be borne out by the history of its adoption, having, when before the people, been zealously urged by the friends of temperance, and as zealously opposed by those engaged in the liquor traffic of that day.
The real significance of this provision in the constitution has been a source of no little doubt and controversy. Many, if not a majority of the people of the state, supposed that if no license were granted to traffic in intoxicating liquors, the traffic would be illegal, aud perish for the want of protection, and by the infliction of such penalties as might be imposed under Jaws made to regulate the evils resulting from the traffic. And it may be observed that the practice that had prevailed under laws enacted at an early day,’and continued in force to the adoption of the constitution of 1851, of licensing the traffic in liquors as a *558 beverage, had educated the people to suppose that, without a license, such traffic could not be carried on-in the forms it had been usual to license it. See the history of .the legislation on the subject in this state by Judge West in his argument in State v. Hipp, 38 Ohio St. 206, and also the able dissenting opinion of Jonnson, J., Id. 234. If this is a correct interpretation of the provision, it has proved a great delusion, for its practical working has been to make the traffic in a measure free. Laws, enacted for the regulation of the traffic, have not been enforced, have become in a measure obsolete, and the traffic and its abuses have grown to such proportions as to justly alarm all who reflect upon the interests of the state and society.
There seems, however, little difference of opinion as to the definition of a license. It is defined, in its general sense, by Okey, J., in State v. Hipp, as “permission granted by some competent authority to do an act which, without such permission, would be illegal.” This agrees in substance with the definition as given in a number of other cases. Home Ins. Co. v. Augusta, 50 Ga. 530; Pleuler v. State, 11 Nebraska, 547. In Chilvers v. People, 11 Mich. 43, it is said: “ The object of a license is to confer a right that does not exist without a license.” “ The popular understanding of the word license undoubtedly is,” says Cooley, J., in Youngblood v. Sexton, 32 Mich. 406, “ a permission to do something which without the license would not be allowed,” and he adds, “this is also the legal meaning.” In State v. Frame, 39 Ohio St. 399, the language employed by Mcllvaine, J., is somewhat different, but the definition is in substance the same. lie says: “A' license is essentially the granting of a special privilege to one or more persons, not enjoyed by citizens generally, or, at least, not enjoyed by a class of citizens to which the licensee belongs. A common right is not the creature of a license.”
The result of the definitions that have been given of a license is implied in its etymology, is in conformity to the sense in which the word is ordinarily used/ and may be regarded as strictly accurate. That is permitted that *559 can not be done without permission; and to say that a person is permitted, licensed, to do what he may lawfully do without permission, is a misuse of words.
Hence, unless it can be shown that a simple tax on the traffic eularges -the privileges of those engaged in it, or confers a right that did not previously exist, there is no ground for saying that the tax is a license of the business. It would not be claimed that a tax upon the property employed in the business, as the fixtures and stock in trade, is a license to carry it on. And yet a tax upon the business itself is no more the granting of a permission to engage in it than is the levyiug of a tax upon the property employed in the business. In either case, if the tax is not paid, the property of the owner liable to the tax may be distrained by the state and sold to satisfy it.
• The distinction between a tax upon a business, and what might be termed a license, is, that the former is exacted by reason of the fact that the business is carried on, and the latter is exacted as a condition precedent to the right to carry it on. In the one case the individual may rightfully engage in and carry on the business without paying the tax; in the other he can not. This seems to be the distinction upon which the case of State v. Hipp was decided. See opinion of Okey, C. J., 38 Ohio St. 226-229; also of McIlvaine, J., in State v. Frame, 39 Ohio St. 412.
A simple tax upon «the traffic does no violence to the principle upon which the clause, inhibiting a license, was inserted in the constitution. This inhibition certainly arose from a sentiment in the minds of the people that the traffic was wrong and should not be encouraged, not from the persuasion that it was right, and of such utility that it would be impolitic to impede it by any restrictions upon the liberty of pursuing it. By the imposition of a tax there is no sanction given of the propriety or utility'of the business taxed; in the case of a license there is. The-legislature finds a business productive of evils to the state and society, in which many persons are engaged, and imposes a tax upon it; in so doing, it neither directly approves *560 nor disapproves the business itself. It may, however, imply a good deal. The imposition of a tax on the owner of a dog implies, if it implies any thing beyond the purpose to protect the husbandry of sheep, a disapproval of the business of keeping a dog. It is not intended to dignify the busiuess; and the same is true of a tax imposed upon the liquor traffic.
It is further argued that the provisions of the second section, whereby the assessment is made to attach as a lien upon the real estate in which the business is carried on, has the effect of a license. The argument is that “ none but the owners of real estate can carry on the traffic, unless the landless man can obtain the consent of the landowner that his real estate shall be bound for the payment of the assessment provided for by the act.” This is fallacious. The right to determine who shall have leases and who not, and the terms thereof, are not prescribed by the statute. Every person has the right under the statute to rent property and engage in the business if he desires to do so. It is true, that if one, who is not the owner of real estate, desires to engage in the business, he will have either to purchase or rent it, but this would be so, whether the law did or did not impose a tax on the business. It is 3rot the law that creates the impediment to the individual in this regard, but his own circumstances. The law does not create the necessity for a place.in which to do business; this is a physical one. It does not require that it shall be carried on in leased premises; whether carried on by an owner in fee or a lessee the business is alike lawful, and all are as free to acquire real estate in any of the recognized modes as they were before the enactment of the law. '
The law, in any of these particulars, is silent. It, by section 1, simply imposes an annual assessment of $200 upon the business of every person trafficking in intoxicating liquors, and for each place where such business is carried on by him ; and an assessment of $100 where the traffic continues through the year, exclusively in malt or vinous liquors, or both; and, by section. 2, provides that the *561 assessment shall attach and operate as a lien upon the real property on and in which the business is conducted, as of the fourth Monday of May each year, and shall be paid at the times provided by law for the payment of taxes on real or personal property.
If this law in any way impedes the purpose of any person to engage in the liquor traffic, it arises from extraneous circumstances, and not the law. But, if it were otherwise, would that make it a license law? As shown, the nature of a license is to create a right that did not exist and could not exist without the license. An impediment is of the opposite effect; it confers no right that did not exist; it simply impedes or burdens an existing one. It is within the power of the legislature to provide against the evils resulting from the traffic in liquors. Impediments to the transaction of the business may be one of the most efficient modes of accomplishing this; and where they arise from laws general in terms they can not be characterized as a license of the traffic, though some may be impeded more than others.
It is further argued that the law is a license itself. It is true that under this law liquor may be sold to bo drank on the premises where sold. In this respect a part of the traffic has been legalized that was illegal before. This, however, was not accomplished by the levying of a tax on the traffic, but by the repeal of a law that made such sales illegal. It was competent to the legislature to have repealed this law without authorizing the levy of a tax. If this had been done, would it be claimed that the repeal was a license within the meaning of section 9, article 15 (section 18 of the schedule) ? If such construction were allowed, then any statute restraining the liquor traffic in any form, when once enacted, would, by force of the constitution, become as immutable as were the laws of the Medes and Persians. So absurd a position would not, we suppose, be taken by any one; for it must be conceded that, however unwise it would be to do so, it is competent to the legislature to re *562 peal every statute that has been enacted regulating the traffic ; and it would then be as free as the traffic in any thing else. Now, if this were done, and the legislature should then impose a tax upon the business, what new privilege would thereby be conferred on the traffic? In what way would the payment of the tax be a license to do what the individual had an unbridled license to do before he paid it ? It is then apparent that, to avoid the most palpable absurdities, a meaning must be attributed to the term license, as used in the constitution, that is other and different from what is imputed to it in the argument of counsel — that the tax imposed upon the liquor traffic by this statute is a license to engage in the business.
II. The next question that arises is, as to the power of the general assembly to impose a tax upon the business of trafficking in intoxicating liquors. It matters not what propriety in the use of terms may require us to designate the power under which this tax has been imposed by the legislature, if it can reasonably be shown to exist, that should restrain any court from declaring the statute unconstitutional; nay, more, if it were doubtful a court should refrain from so doing. The making of laws is committed to the general assembly; it is the judge of the wisdom and policy of all its enactments, and no court has the right to overrule its judgment, even as to the extent of its own powers, unless it has clearly and beyond doubt exceeded the legislative functions with which it is invested by the constitution. This is so generally recognized as true as to be regarded as axiomatic upon all questions as to the power of a legislature to enact a given law.
In considering the question as to the validity of this tax, it is not necessary to affirm that the power exists to levy a tax upon any and every business that is carried on in the state by any of its citizens, without regard to the purpose for which it is laid.
This is an assessment in the form and nature of a tax upon the business of trafficking in intoxicating liquors, carried on by any person in the state; and, is there power in *563 the geueral assembly to levy a tax upon this business, is the question. We think, without doubt, there is. As observed, it is not material as to what the power should be called. But, we think, it may properly be termed a police power, recognized by the constitution as within the legislative authority, conferred by that instrument upon the general assembly, over the business of trafficking in intoxicating liquors. Whatever limitations may exist upon the power of the general assembly to levy taxes upon vocations in general, the framers seem to have removed any as to this traffic. With the exception of lotteries, which are prohibited, it is the only business of the citizen, that they thought proper, or necessary, to designate as a source of evils; and, in so doing, they specifically empower the general assembly to regulate these evils. No method of accomplishing this is designated, and the power is, therefore, left to be exercised by the general assembly, in its plenitude as the legislature of the people, subject only to such express limitations as are-imposed in that instrument. What are they ? If any, other than the clause in section 9, article 15 (section 18 of the schedule), it must be that provision of the constitution (section 2, article 12) requiring all taxation upon property to bp by a uniform rule according to its true value in money. Other objections as to the existence of the power do not, as we shall presently show, arise out of the terms of the constitution. . If this provision applies, it must be because this assessment is a tax on property, arid that no other form of taxation is permissible under the constitution. It may be that an exhaustive analysis would show that any tax, whether per capita, on occupations, or on the valuation of property is, in fact a tax on property itself. But these distinctions existed when the constitution was adopted, and are well recognized. Cooley’s Const. Lim. *496. They are in fact recognized in the constitution. As a possible mode of taxation, a poll-tax is prohibited (section 1, article 12). But if it is a tax on property, why should it be expressly prohibited? Ifitis such a tax, it is included in the terms of.section 2, article 12, and could not be levied without violating *564 its requirements. An assessment is also a tax on property, levied according to benefits conferred on tbe property, and has been recognized as a permissible mode of raising money for tbe construction of roads and ditches. The general assembly is empowered, by section 6, article 13, to restrict the use of assessments by cities and villages, so as to prevent the abuse of the power. But in Reeves v. The Treasurer of Wood County, 8 Ohio St. 333, it was held that assessments are not embraced in the meaning of the word “taxing,” as used in the second section of the twelfth article of the constitution, and that the power to authorize them is comprehended in the general grant of 'legislative power. They had been in use as a well recognized mode of raising money for such purposes before the present constitution was adopted, and were notabrogated by it.
Labor upon the highways is a-form of taxation. Bur-rough’s on Tax., section 5. Tolls upon the persons or property, making use of the works of public improvement owned and controlled by the state, are also a species of tax. Cooley Const. Lim. *496. Tolls have been constantly levied and collected upon such improvements in the state whilst under its control, and labor upon the highways has been required and performed without question, since, as before, the present constitution was adopted. A tax on occupations was not unknown to the people of the state. They had been imposed and sustained by the supreme court in bank (State v. Gazlay, 5 Ohio, 15). In an instrument framed with such care as the constitution of 1851, to limit and define the powers of government, especially that of taxation, would it not be strange that its authors should have been careful to prohibit, in express terms, one of two well-known forms of its exercise, if their intention had been to prohibit both ? Such intention can not be inferred from the language used in section 2, article 12, as a poll-tax is as much a tax on property as it is a tax on vocations. But neither is within the meaning of that section ; and, if the purpose had been to abrogate the power to levy a tax on the business of the *565 citizen, we see no reason why it would not have been done by the use of express language, as was done in the case of a poll-tax. It is not intended to decide that the power exists to levy a tax on a business or vocation for any purpose of revenue, independent of other considerations. Such question is not presented in this, case. In this country, the adoption of a written constitution by the people of a state is rather to define and limit an existing polity than to introduce a new one; and it is generally understood that any power conferred is, unless enlarged by express language, to be exercised in the customary way and subject to such qualifications as had usually been observed.
Since the adoption of the present constitution a variety of cases have arisen and been decided in this court from which these principles may be deduced:
1. The power of taxation is limited, but not conferred, by section 2, article 12, of the constitution. It is included in the legislative power conferred on the general assembly by section 1, article 2, of that instrument. The limitation is on the power to raise revenue by the taxation of property; all other recognized modes of exercising the power maybe resorted to by the legislature, whenever in its wisdom it may be deemed necessary. Baker v. Cincinnati, 11 Ohio St. 534.
2. Whenever the pursuit of any business is attended with such inconvenience and evils as to make it a source of burden to the general public, beyond what results from the pursuits of men in general, it is competent to the legislature to burden the business, distinguished in this regard, with such taxes as will afford indemnity to the general tax-payer for the increased burden thus imposed on him, and tend to repress the evils connected with the business itself.
The leading case is that of Baker v. Cincinnati, supra, sustaining a tax that had been levied in the form of a license upon theatrical exhibitions, under an ordinance of the city imposing a tax upon such exhibitions and various other employments, in pursuance of authority conferred by statute. *566 The tax imposed was much in excess of the fee*charged for issuing the license; and, to the objection raised on this ground, G-holson, J., said:
“ The exhibition may require additional attention from those intrusted with the care of the public peace to prevent disorder and disturbance. The burden thus devolved on public officials, requiring, perhaps, an increase in their number or compensation, for- the benefit of exhibitors of shows or performances, may justly authorize a charge beyond the mere expense of filling up a blank license. The same principle that would authorize a charge for the one extends to the other. To say that it is a tax and goes into the public treasury does not disprove this object. There is no magic in names.”
The same principle has been applied in a number of other cases. Cincinnati Gaslight and Coke Co. v. The State, 18 Ohio St. 238; Western Union Tel. Co. v. Mayer, 28 Ohio St. 534. In Holst v. Roe, 39 Ohio St. 340, a tax on the business of keeping a dog was sustained, as a reasonable way of compensating the husbandry of sheep for losses sustained from such business. And in Frame v. State, supra, the tax -on the traffic in intoxicating liquors, imposed by the Scott law, was sustained on the same principle; and in the subsequent case of Butzman v. Whitbeck, there was no disapproval of this point.
That in some of these cases the tax was levied in the form of a license does not amount to a difference in principle. In the one case the right to carry on a lawful business is withheld until the tax is paid; in the other it-is not. In either case the tax is on the business, and the principle on which it is imposed is the same — indemnity and protection to the public against evils resulting from the nature and character of the business.
In an ingenious brief that has been furnished us by able counsel of the plaintiffs in error, it is asserted, as a proposition, “ that whenever the only regulation or restraint connected with the imposition of a burden upon a business or calling consists in the repressive tendency which is the *567 incident of all taxation, -the imposition can not be considered as made under the police powers of the state, but must be regarded as an attempted exercise of the power of taxation.” How this can be. is not apparent in the statement, nor made so by the reasoning of counsel. If the liquor traffic is a source of evils, and, from the language of section 9, article 15 (schedule section 18), it was certainly regarded as such by the framers of the constitution, then the more the traffic prospers the greater the evils resulting from it will be, and the more it is repressed the less they will be. Nor is it consistent with an admission made in limine, “ that the state may impose burdens upon certain occupations and employments with a view to the protection of the health of the citizens, or for the preservation of good order, or to secure the safety, convenience, or general welfare of the community.”
Term the power conferred in section 9, article 15 (section 18 of the schedule), what you may, and it can not, we think, be denied that, if the imposition of a tax upon the traffic in intoxicating liquors will have a tendency to reduce the evils resulting from the traffic, its imposition must be regarded as a legitimate exercise of the power therein conferred; and, as before stated, the mode of its exercise has been left to the discretion of the general assembly, limited only by such restrictions as have been imposed upon the exercise of its legislative power; for, though it be termed a police power, it is, nevertheless, legislative in character, aud is subject to the limitations upon that power, an.d none other. Mellvaine, J., observes in Frame v. State: “ The direct tendency of these burdens is to reduce the number of places where such traffic is conducted, and the number of persons engaged in it, and, per consequence, the quantity of liquors drunk.” And adds, “ that it would be impossible to say that the amount of evil will not be diminished.” 39 Ohio St. 411.
A specious argument is made to the effect that if the supremacy claimed for the legislature in the enactment of laws for the regulation of the liquor traffic exists, then it may make the traffic in any form a crime, and punish a *568 violation without a court or jury. The fallacy consists in assuming that unlimited legislative power is claimed for the general assembly over the traffic. No such claim is made. The claim is, that its power is as unlimited over this subject of legislation as over any other within its province, except that it can not license the traffic. To show that a given limitation does not apply in a particular instance is not a showing that it does not apply in any, nor that there are no limitations on legislative power whatever. Such, however, is the logic of the argument made in this regard.
The traffic being the acknowledged source of much of the crime and pauperism in the state, the appropriation of the funds arising from the tax is in accord with the spirit of the law — part being distributed to the general fund, from which the costs of the state created in the prosecution of crime are paid, and part to the police, and part to the poor fund.
The question of the power of the state to impose and collect special taxes, in the nature of police regulations, will be found treated, with his usual ability and clearness, by Judge Cooley, in his work on Taxation, chap. 19. The fact that, in the interest of sobriety and good morals, he is evidently a zealous advocate of the regulation of the whisky traffic, by a tax imposed on the business, should not, as we think, impair the value of his authority in this regard.
III. The next objection to the validity of this statute is, that the summary methods by which the tax and penalties imposed by it are assessed and collected, deprive the individual of the guaranty contained in the sixteenth section of the bill of rights, that “ every person for an injury done him in his lands, goods, etc., shall have remedy by due course of law;” and, for a like reason, violates the clause in the fourteenth amendment of the federal constitution, “ nor shall any state deprive any person of life, liberty, or property, without due process of law.”
It is apparent, from the terms employed, that the clause incorporated by this amendment in the federal constitu *569 tion imposes no limitation upon the legislative power of the general assembly of this state that had not been imposed by its bill of rights. Due course and due process of law are one and the same thing. We do not feel required to enter upon any extended discussion of this important constitutional guaranty. Eor whatever of doubt there may be in its application to a variety of eases, it is well settled that it does not affect the usual modes that have been long adopted for the assessment and collection of taxes; in other words, these modes are recognized as due process of law. “It has long been settled that while one is to be protected in his interests by the ‘ law of the land/' he has a right to ‘ the judgment of his peers ’ only in those cases in which it has immemorially existed, or in which it has .been expressly .given by law. The clause recited from Magna Charta does not imply the necessity for judicial action in every case in which the property of the citizen may be taken for the public use. On the contrary, a legislative act for that purpose, when clearly within the limits of legislative authority, is of itself the law of the land. And an act for levying taxes ... is within the unquestioned and unquestionable power of the legislature. It is, therefore, the law of the land, not merely in so far as it lays down a general rule to be observed, but in all the"proceedings and all the process which it points out or provides for in order to give the rule full operation. . . . There is a tacit condition annexed to the ownership of property that it shall contribute to the public revenue in such mode and proportion as the legislative will shall direct; and if the officers intrusted with the execution of the laws transcend their powers to the injury of an individual, the common law entitles him to redress. But to pursue every delinquent liable to pay taxes through the forms of process and a jury trial, would materially impede, if not wholly obstruct, the collection of the revenue. There is no room for the supposition, that in a matter of this public importance, where promptness in collection is always desirable, and often imperative, dilatory proceedings of this nature were *570 within the contemplation of the people when consenting to any general provision of the constitution.” Cooley on Taxation, 49.
In England arbitrary exactions, without authority of parliament, were a frequent source of public irritation and complaint, and had much to do with the misfortunes of the Stuart dynasty. But in the whole course of English history no case occurs where the validity of a tax in the many and varied forms it was imposed, for the purpose of raising revenue, was called in question on the ground that the manner in which it was authorized to be collected was not due process of law. The subsidies, etc., were generally collected by commissioner’s (Blackstone’s Commentaries, B. 1, ch. 8), and if the methods varied from the manner and form in which taxes are collected in this country,, it will not be affirmed that the variance was in favor of the subject, or, had in it more of the levin of “due process of law.” Delinquency was not always punished by the extraction of teeth, nor was it awarded the determination of a court and jury. The people of this country, in their colonial and subsequent history, have always collected taxes through the agency of administrative officers. The courts have remained open to those who could show that they had been aggrieved; but, that the state should resort to the courts for the purpose of making collections, or in enforcing penalties for frauds and delinquencies, has not been allowed, and but little insisted on. It will hardly be affirmed that grievances connected with the method of collecting taxes led to the adoption of the'fourteenth amendment of the federal constitution; nor has the supreme tribunal of the nation, as yet, manifested any disposition to so construe it. Eor any excesses in this regard, the individual will most likely find ample protection in the constitution and courts of his own state.
The result of the decisions of the supreme federal tribunal in giving a construction to this amendment, so far as it affects the revenue laws of a state, is summed up by the learned author from whom we have before quoted, in his *571 work on Taxation, at page 51. By these decisions such laws may be in harmony with that amendment, though they do not provide for giving a party an opportunity to be present when the tax is assessed against him, and to be there heard, if they give him the right to be heard afterward in a suit to enjoin the collection in-which both the validity of the tax, and the amountof it, may be contested; and it is immaterial to this question that the party to the suit is required, as in other injunction cases, to give security when instituting the suit. He cites the following: McMillen v. Anderson, 95 U. S. 37; Hagar v. Reclamation District, 111 U. S. 701; Davidson v. New Orleans, 96 U. S. 97, and other cases, which certainly bear out the text of his work.
This statute contains no unusual or extraordinary provisions for the assessment and collection of the tax. The apportionment is made by the legislature in the first section of the act. This is the province of the legislature. When taxes are thus laid upon a business, ministerial officers have nothing to do but to list the persons engaged in the business and collect the sums which the laws have definitely fixed, Cooley Taxation, 238.
Penalties are attached for non-payment, and the assessments, with penalties attached, are to be collected in the same manner as other taxes, and so as to the lien on the real estate where the business is conducted. There is.no ground for complaint in these particulars, unless a distinction can be drawn between this and other taxes, as to the manner in which it should be collected. There is none apparent that seems founded in aüy reason. True, it is not a tax levied for general revenue. It is a special tax levied with a twofold purpose: Eirst, to diminish the traffic in intoxicating liquors as a beverage, and thereby correspondingly reduce the evils resulting from it. Second, to compel the business to contribute a fund where with, as a matter of distributive justice, to re-imburse the general tax-payer for the increased burdens imposed on him by the evils incident to the liquor traffic, in which it is distinguished from the *572 pursuits of men in general. It is no objection to a tax that it is laid for tire double purpose of regulation and revenue. 2 Desty on Taxation, 1384. What reason then exists for the assessment and collection of this tax in any form different from that of taxes in general. The same reasons exist iti the one case as in the other for'a collection in a summary administrative mode.
The most stress is, however, placed upon the clause in section 5, doubling the assessment in case of a refusal of the individual to furnish the requisite information to the assessor to make the required statement, or to sign or verify the same. The argument assumes that this is done without notice to the party. The very contrary is the fact. The refusal must be “on demand.” The demand is notice of what must follow a refusal. There is no ground for complaint here, unless obstinacy can be claimed as a right. It is the same in principle as the provision in the general tax law applicable to the case where a party refuses to list his property, or to swear to the return of the assessor; the fact is returned by the assessor and the amount as returned by him is increased fifty per centum by the auditor. Section 2784, Revised Statutes. The power to impose such penalties for false returns was sustained in Genin v Auditor, 18 Ohio St. 534. In Champaign County Bank v. Smith, 7 Ohio St. 42, the auditor of the county had placed upon the duplicate for taxation certain stocks owned by the bank, without notice to it. The statute required notice, and the court held it could not be dispensed with. Hence this case is no authority for saying that the addition of a penalty for a refusal to sign or verify a return on demand, is not due proeesss of law, and that the clause in the statute authorizing it to be done is invalid.
It is also argued that if the assessor makes a wrongful return, this is made conclusive on the party. There is no warrant in the law for this statement. If the assessor return what is not the fact as to the business of an individual, or if he return that he refused to furnish information, or to sign or verify the statement, when in fact he did neither, *573 he would not be concluded. The courts would certainly be open for its correction; and if the return was not only wrongfully, but willfully made, the assessor would be liable upon his bond to the party aggrieved. Whether he may or may not be entitled to an appeal to some-other administrative officer or board, does not affect the question. An ■appeal is not a matter of right in judicial, and much less in administrative proceedings. As between an appeal to some other officer, and a suit in a court whose doors ■are open to him, there is no substantial difference. Due process of law has reference to the procedure in the first instance. Where the party has a chance to be heard before the officer appointed to make the assessment and return, he can not be heard to say that he has been injured in his property, without due process of law, because no mode of appeal is provided.
IV. The objection to the statute, that it is not general and uniform in its operation, is based upon the fact that it does not include the manufacture of intoxicating liquors from the raw material, and the sale thereof by the manufacturer of the same in quantities of one gallon or more at any one time.
All legislation consists, to a greater or less extent, in the creation and definition of categories to which the provisions of a statute are applied by the legislature. Thus, in defining and punishing larceny, a theft of personal property of the value of thirty-five dollars or more is made a felony and punished by imprisonment in the penitentiary, but if the property taken is a cent less than thirty-five dollars it is simply a misdemeanor and very differently punished; yet the essential character of the act punished is much the same in both cases. The majority of males is fixed at the age of twenty-one years and that of females at eighteen. Yet many males at twenty are quite as competent to act for themselves as others are at twenty-five. There is, however, a necessity for a distinction; and the legislature in making it has, in the case of a felonious larceny, done so by drawing the line for a simple misdemeanor, at thirty-five *574 dollars in the valuation of the property taken; and in defining the legal capacity of a male to act as a person sui juris, has arbitrarily done so by making it include all male persons of twenty-one years and over. The generality and uniformity of these laws have never been questioned ; and many similar instances might be adduced. The law of 1854, to provide against the evils resulting from the sale of intoxicating liquors, prohibited its sale to be drank upon the premises where sold, but made an exception in favor of beer, ale, cider, and wine manufactured from the pure juice of the grape cultivated in this state, although well known intoxicants; and the validity of the law was sustained in Miller v. State, 3 Ohio St. 475, after every conceivable objection that the ingenuity of able counsel could devise had been made to it.
It was for the legislature to determine the forms of the traffic that required to be regulated as a source of evil. It has in a measure drawn the line between the distillery and the brewery, on the one hand, and the saloon on the other. There is nothing unreal in the distinction. It is known by all men, and in one respect probably too well by many men. And unless absolute prohibition is resorted to, no more practical distinction could be made. The evils that result from the use of intoxicating liquors as a beverage occur at the place where it is sold as such, not where it is manufactured and sold in large quantities. But if the legislature has erred in not including what has been excepted from the operation of the law, it is simply an error of judgment in the exercise of its authority and can not be reviewed by the courts.
It is averred that, from a long time prior to the enactment of this law, the plaintiffs have been engaged in the traffic in intoxicating liquors, and have had a large amount of property invested in the business; and it is claimed that the law can not be made applicable to them without impairing vested rights. The claim is not tenable. It would subvert the power to provide against the evils of the traffic, and place it superior to any regulation whatever. *575 The provision of section 9, article 15 (section 18 of the schedule) of the constitution has stood, sinee its adoption, as a perpetual admonition to all persons engaging in the traffic, that, in doing so, they place their property, invested in the business, subject to the power of the general assembly to provide against evils resulting from the traffic. The same argument, was made in Miller v. State, supra, against the act of 1854 prohibiting, among other things, the sale of liquor to be drunk on the premises where sold; but it met with no favor in the court. The law was held valid. See opinion of Thurman, J., in the case 3 Ohio St. 484-7.
No prescriptive right can be claimed by persons engaged in the whisky trafile against the exercise of its functions by the legilsature of the state. It was said by Taney, C. J., in The License Cases, 5 How. U. S. 577: “ If any state deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery, I see nothing m the constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper.”
The question whether the tax can be made to attach as a lien on the property in which the business is conducted, as against the owner, where carried on by his lessee and not .himself, is not presented in this case. All, on whose behalf it is prosecuted, are engaged in the traffic; and, as we have shown that its provisions do not operate as a license, in any sense of the term, and that the tax may be levied upon the business and made a lien upon the property of those engaged in it, its provisions must be enforced as to the plaintiffs, whether it can be or not as to the property of the lessor not engaged in the business. “ In construing statutes, the rule is to enforce them so far as they are constitutionally made, rejecting only those provisions which show an excess of authority by the enacting power.” Rirchard, J., in Cincinnati v. Bryson, 15 Ohio, 645. This is in conformity to a settled maxim of construction, ut res magis valeat quam pereat, and the clearly expressed inten *576 tion of the legislature, contained in the statute, that “the abrogation . ■ . . of any section or clause of this act shall not be held to abrogate . . . any other section or clause thereof.” § 13 (88 Ohio L. 161). “ Every presumption must be taken in favor of the validity of statutes.” McIlvaine, J., in Frame v. State, supra, 416.
The judgment is affirmed, without prejudice to the right of any of the parties to prosecute a separate action for relief against any erroneous or wrongful return that may have been made by the assessor as to his business.
Owen, C. J., and Eollett, J., dissent.